IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDWARDS LIFESCIENCES LLC AND EDWARDS LIFESCIENCES PVT, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 12-023-GMS |
| MEDTRONIC COREVALVE LLC, MEDTRONIC CV LUXEMBOURG S.A.R.L., MEDTRONIC VASCULAR GALWAY LTD., MEDTRONIC, INC., AND MEDTRONIC VASCULAR, INC., | ) | REDACTED: PUBLIC VERSION |
| Defendants. | ) | |

**LETTER TO THE HONORABLE GREGORY M. SLEET FROM DAVID M. FRY REGARDING MEDTRONIC'S MOTION *IN LIMINE* NUMBER 1(a)**

OF COUNSEL:
Martin R. Lueck
Jan M. Conlin
Stacie E. Oberts
Sharon E. Roberg-Perez
Andrew D. Hedden
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
Minneapolis, MN 55402-2015
(612) 349-8500

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc., and Medtronic Vascular, Inc.*

Dated: December 12, 2013

cc: ALL COUNSEL OF RECORD



David M. Fry
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
dfry@shawkeller.com

December 12, 2013

**BY CM/ECF & HAND DELIVERY**
The Honorable Gregory M. Sleet
U.S. District Court for the District of Delaware
844 N. King Street
Wilmington, DE 19801

REDACTED:
PUBLIC VERSION

Re: *Edwards Lifesciences LLC, et al. v. Medtronic CoreValve LLC, et al.*,
C.A. No. 12-23-GMS

Dear Chief Judge Sleet:

Pursuant to the Court's Order dated December 5, 2013 [D.I. No. 130], Medtronic submits this letter brief in support of its motion *in limine* # 1(a) to exclude documents or testimony that only the frame of the accused CoreValve device need be compressible to an external diameter capable of being introduced through an 18 French arterial introducer to infringe the asserted claims.

This Court construed the limitation "18 French arterial introducer" to mean "a sheath with a diameter of 5.7 mm or less that facilitates delivery of a catheter to an artery." [D.I. 103 at 3.] The patent claims an introducer sheath of a particular size. Whatever will be introduced into the body must fit within that dimension. The claim does not specify the size of a component, but rather limits the size of the sheath through which the device must pass to be introduced into the body.

***Edwards now argues that <u>only</u> the frame of the CoreValve device need be compressible to a diameter of 5.7 mm*** for transcutaneous introduction to satisfy this limitation. Edwards' argument conflicts with the claim language, the prosecution history, and common sense. The limitation "the frame being compressible to a compressed external diameter capable of being introduced through an 18 French arterial introducer and into a patient's vasculature using a catheterization technique" can only be understood to mean the entire prosthetic valve assembly must be capable of introduction into a patient's vasculature through a sheath with a diameter of 5.7 mm or less.

The plain language of the claim explicitly requires a "valvular structure sewn to the frame," "an internal cover made with pericardial tissue and sewn to the frame," and a frame "capable of being introduced . . . into a patient's vasculature." In addition, the prosecution history provides clear and unmistakable evidence demonstrating that this is precisely how Edwards understood this language. Accordingly—even if the language of the claim as a whole could be read to permit Edwards' belated construction of this limitation (which it cannot)—Edwards disclaimed its proposed construction during prosecution of the parent application to the '825 patent.

**The Plain Language of the Claim Requires the Prosthetic Valve Assembly to Be Capable of Delivery into a Patient's Vasculature Through an Arterial Introducer.**

In claim 1, ***the compressed frame explicitly includes a valvular structure and internal cover***. The plain language of the claim requires the ***valvular structure and internal cover to be sewn to the frame***. Because the valvular structure and internal cover must be sewn to the frame, compressing the frame ***necessarily*** also compresses the attached valvular structure and internal cover as well. The claim further recites that the frame must be ***capable of being introduced into a patient's vasculature*** using a catheterization technique. The only way for the claimed device to achieve its purpose—implantation of a prosthetic ***valve*** in a stenosed aortic valve—is for not only the frame, but the entire prosthetic valve assembly to be introduced through a catheter into the patient's vasculature.

Claim 1 recites, in pertinent part:

> A prosthetic valve for implantation in a stenosed aortic valve, comprising: a metallic frame having intersecting bars, the ***frame being compressible to*** a compressed external diameter capable of being introduced through an 18 French arterial introducer ***and into a patient's vasculature using a catheterization technique***, the frame being expandable ***for implantation in the stenosed aortic valve*** . . . ; a flexible valvular structure made with pericardial tissue, ***the valvular structure sewn to the frame*** with stitches made directly around the bars of the frame . . . ; and ***an internal cover*** made with pericardial tissue and ***sewn to the frame***, the internal cover fastened on an internal surface of the frame . . . .

[Ex. 1 at 21:34-57 (emphasis added).]

This language ties the size requirement directly to the ability to introduce a device through an arterial introducer into a patient's vasculature via a catheterization technique. The claim and the Court's construction of "18 French arterial introducer" can therefore only be understood to require that the prosthetic valve assembly, as it is actually introduced into the patient's vasculature, must be capable of passing through a sheath with a diameter of 5.7 mm or less. Claim construction "demands interpretation of the entire claim in context, not a single element in isolation." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999). Edwards' effort to ignore these additional elements and divorce the compressibility requirement from the contextual language of the claim would result in an erroneous construction.

Edwards' proposed reconstruction of the limitation is nonsensical and would result in a device incapable of achieving the stated purpose of the claim. If the frame alone were introduced into the patient's vasculature using a catheterization technique, as suggested by Edwards, the valvular structure and internal cover could not be sewn to the frame. And if the frame alone, without the valvular structure and internal cover sewn inside, were implanted in the stenosed aortic valve, the claimed invention would not meet its purpose—the claim describes a valve, not an empty frame, for implantation using a catheterization technique. Edwards' proposed construction thus not only ignores limitations of the claim, it would defeat the entire purpose of the claimed invention.

The limited written description in the specification of the ’825 patent supports Medtronic’s understanding of the claim. The specification consistently refers to diameters of 5.7 mm or less as ***restricting the size of the entire prosthetic valve assembly as it is delivered through the arterial introducer***, not as defining the compressibility of the frame standing alone.

For example, the specification states “[w]hen folded by compression, the diameter of said frame is about 4 to 5 millimeters, in view of its transcutaneous introduction in the femoral artery through an arterial sheath of 14 to 16 F . . . i.e., about 4.5 to 5.1 mm.” [*Id.* at 8:62-66.] The specification explains that the valvular structure must be fastened on the inside surface of the frame, and that “[a]fterwards, it is compressed in its minimal size, i.e., 4 or 5 mm, in diameter in view of its introduction in the femoral artery.” [*Id.* at 9:49-55.] The ’825 patent further states that “[t]he valvular structure 14 is compressed inside the frame 10 when this is in its compressed position (FIG. 4*a*), i.e., it fits into a 4 to 5 mm diameter space.” [*Id.* at 10:24-26.]

The specification repeatedly and consistently refers to the size of the prosthetic valve assembly as it is delivered through the introducer into the patient’s vasculature:

> ***Since it is aimed at being positioned in the heart after having been introduced by a catheterization technique*** by a transcutaneous route in a peripheral artery, mainly the femoral artery, ***the IV should preferably have the smallest possible external diameter.*** Ideally, it should be able to be introduced in the femoral artery through a 14 F (4.5 mm) size arterial introducer which is the size of the arterial introducer commonly used to perform an aortic dilatation. However, a 16 F (5.1 mm) or ***even a 18 F (5.7 mm) introducer would also be acceptable.***

[*Id.* at 14:4-13 (emphasis added).]

Edwards apparently relies on the absence of an explicit reference to the prosthetic valve assembly in the clause “the frame being compressible to a compressed external diameter capable of being introduced through an 18 French arterial introducer and into a patient’s vasculature using a catheterization technique” as the basis for its attempt to broaden the scope of claim 1 to ensnare the CoreValve device. But this clause must be read in the context of the rest of the claim, as the Federal Circuit has clearly explained, and the plain language of the claim compels the conclusion that Edwards’ proposed reconstruction cannot be correct. *See Pause Tech., LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (holding that to ignore clause appearing later in claim would result in construction that “impermissibly conflicts with the plain meaning of the claim”).

**The Prosecution History Confirms That the Entire Prosthetic Valve Assembly Must Be Compressible for Introduction Through a Sheath with a Diameter of 5.7 mm or Less.**

The prosecution history confirms Medtronic’s position. Edwards’ arguments in response to a rejection during prosecution of U.S. Application No. 11/942,690, the immediate parent to the ’825 patent, establish that ***the compressibility requirement of claim 1 applies to the entire prosthetic valve assembly, and not just the frame***.

After a rejection based on U.S. Patent No. 5,411,552, Edwards amended then-pending claim 21 of the ’690 application to require a “stent . . . being collapsible to a collapsed diameter of 5.7 millimeters or less for advancement through an introducer and into a patient’s vasculature via a catheterization technique” in addition to “a flexible valvular structure . . . fastened to a middle portion of the stent” and an “internal cover . . . sewn to the stent.” [Ex. 2 at 6-7 (underline in original).] Edwards then distinguished the ’552 patent by arguing:

> There is no teaching or suggestion in the cited references regarding a prosthetic valve assembly comprising a stent, a valvular structure and an internal cover, ***wherein the entire prosthetic valve assembly is collapsible to a diameter of 5.7 mm or less*** for advancement through an introducer and into a patient’s vasculature via a catheterization technique.

[*Id.* at 12-13 (emphasis added).]

Edwards disclaimed in the public record at the Patent Office the scope it now seeks to advance in this litigation. The prosecution history provides evidence of how the inventor understood the patent and should therefore be considered in construing disputed claim terms. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

Edwards may attempt to avoid disclaimer on the grounds that the amendment and argument occurred in the parent application, rather than the application that issued directly as the ’825 patent. Arguments made during prosecution of ancestor patent applications do, however, give rise to prosecution history disclaimer. *Omega Eng’g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003). “As long as the same claim limitation is at issue, prosecution disclaimer made on the same limitation in an ancestor application will attach.” *Id.* (citing *Augustine Med., Inc. v. Gaymar Indus. Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999)).

Then-pending claim 21 of the ’690 application contains identical claim structure as issued claim 1 of the ’825 patent. Both claims recite a collapsibility requirement that refers to the stent/frame, but does not explicitly identify the entire prosthetic valve assembly.[1] Both claims also require that the valvular structure and internal cover be sewn to the stent/frame. Edwards unmistakably argued to the examiner that the import of this claim structure is that “the entire prosthetic valve assembly is collapsible to a diameter of 5.7 mm or less.” Because the exact same claim structure appears in claim 1 of the ’825 patent, claim 1 must also require “a prosthetic valve . . . comprising a [frame], a valvular structure and an internal cover, wherein the entire prosthetic valve” is capable of being introduced through a sheath with a diameter of 5.7 mm or less.

---

[1] The ’825 patent uses the words “stent” and “frame” interchangeably. [*See, e.g.*, Ex. 1 at 8:22-23 (“FIGS. 2*a* and 2*b* show respectively an example of a cylindrical frame or stent 10 comprising intercrossing linear bars 11 . . . .”).]

**Medtronic's Argument Regarding the Proper Scope of the Compressibility Requirement of Claim 1 Is Timely.**

The only way to understand the language of claim 1 and properly apply the Court's construction of "18 French arterial introducer" is to require that the entire prosthetic valve assembly must be capable of introduction into a patient's vasculature through a sheath with a diameter of 5.7 mm or less. Medtronic's motion to exclude documents and testimony at issue here attempts to preclude evidence which Edwards seeks to introduce to argue infringement based on a different construction—a construction which Edwards failed to raise during claim construction proceedings. By seeking to admit this evidence, it is Edwards, not Medtronic, who is attempting to advance an untimely claim construction argument.

At the Pretrial Conference, Edwards argued that it represented that it "spelled out this position" with regards to this claim element. [D.I. 131 at 79] In fact, nothing in this litigation through the *Markman* hearing in any way suggested Edwards intended to advance this alternative construction at trial. It was not until Edwards served Dr. Buller's expert report that Medtronic was provided any notice whatsoever that Edwards intended to divorce the compressibility requirement from the other limitations of claim 1 and argue that only the frame need be compressed to a diameter of 5.7 mm or less. In fact Edwards' infringement contentions merely parroted back the language of the claim and then stated: "The CoreValve 2009 Product Brochure depicts the Generation 3 PAV in both compressed and expanded form, and identifies that the device is deliverable via an 18 French arterial introducer." [Ex. 3 at 4-5.] These contentions do not "spell out" Edwards' position but instead confirm that it is the size of the device as actually delivered that is the relevant question for infringement.

Accordingly, and for the reasons set forth above, the limitation "the frame being compressible to a compressed external diameter capable of being introduced through an 18 French arterial introducer and into a patient's vasculature using a catheterization technique" can only be understood to restrict the size of the entire prosthetic valve assembly as it is delivered through the arterial introducer. Medtronic therefore respectfully requests that the Court confirm its prior construction, and preclude Edwards from presenting evidence and testimony regarding a theory of infringement that contradicts the plain language of the claim and is foreclosed by Edwards' own representations to the Patent Office.

Respectfully,

*/s/ David M. Fry*

David M. Fry (No. 5486)

cc: Clerk of Court (by hand delivery)
Counsel of record (by e-mail)

# EXHIBIT 1



US008002825B2

# (12) United States Patent
Letac et al.

(10) Patent No.: US 8,002,825 B2

(45) Date of Patent: *Aug. 23, 2011

(54) **IMPLANTABLE PROSTHETIC VALVE FOR TREATING AORTIC STENOSIS**

(75) Inventors: **Brice Letac**, Mont-Saint-Aigan (FR); **Alain Cribier**, Pavilly (FR)

(73) Assignee: **Edwards Lifesciences PVT, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/915,538**

(22) Filed: **Oct. 29, 2010**

(65) **Prior Publication Data**

US 2011/0040375 A1 Feb. 17, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/942,690, filed on Nov. 19, 2007, now Pat. No. 7,846,204, which is a continuation of application No. 11/110,402, filed on Apr. 20, 2005, now abandoned, which is a continuation of application No. 10/139,741, filed on May 2, 2002, now Pat. No. 6,908,481, which is a continuation of application No. 09/795,803, filed on Feb. 28, 2001, now abandoned, which is a continuation of application No. 09/345,824, filed on Jun. 30, 1999, now abandoned, which is a continuation of application No. PCT/EP97/07337, filed on Dec. 13, 1997.

(30) **Foreign Application Priority Data**

Dec. 31, 1996 (EP) .................................... 96402929

(51) **Int. Cl.**
*A61F 2/24* (2006.01)

(52) **U.S. Cl.** ....................... **623/2.14**; 623/2.17; 623/900

(58) **Field of Classification Search** ................. 623/2.14, 623/2.17, 900, 1.26, 2.12
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,409,013 A 11/1968 Berry

(Continued)

FOREIGN PATENT DOCUMENTS

DE 2246526 3/1973

(Continued)

OTHER PUBLICATIONS

Andersen et al., "Transluminal implantation of artificial heart valves. Description of a new expandable aortic valve and initial results with implantation by catheter technique in closed chest pigs." European Heart Journal (1992) 13, pp. 704-708.

(Continued)

*Primary Examiner* — Brian Pellegrino
(74) *Attorney, Agent, or Firm* — David L. Hauser

(57) **ABSTRACT**

A prosthetic valve for implantation in a stenosed aortic valve. The prosthetic valve includes a compressible and expandable frame formed with intersecting metallic bars and a valvular structure made with pericardial tissue. The frame is compressible for delivery into a patient's vasculature through an 18 F (5.7 mm) arterial introducer using a catheterization technique. The bars of the frame preferably have a diameter in the range of 0.1 to 0.6 mm for providing the frame with sufficient radial strength to resist the recoil force exerted by the stenosed aortic valve after implantation. The prosthetic valve includes an internal cover made with pericardial tissue. The internal cover is fastened to an internal surface of the frame between an inlet end of the frame and the valvular structure for preventing regurgitation.

**20 Claims, 18 Drawing Sheets**

U.S. PATENT DOCUMENTS

3,548,417 A 12/1970 Kisher
3,587,115 A 6/1971 Shiley
3,657,744 A 4/1972 Ersek
3,671,979 A 6/1972 Moulopoulos
3,714,671 A 2/1973 Edwards et al.
3,755,823 A 9/1973 Hancock
4,035,849 A 7/1977 Angell et al.
4,056,854 A 11/1977 Boretos et al.
4,106,129 A 8/1978 Carpentier et al.
4,222,126 A 9/1980 Boretos et al.
4,265,694 A 5/1981 Boretos et al.
4,297,749 A 11/1981 Davis et al.
4,339,831 A 7/1982 Johnson
4,343,048 A 8/1982 Ross et al.
4,345,340 A 8/1982 Rosen
4,373,216 A 2/1983 Klawitter
4,406,022 A 9/1983 Roy
4,470,157 A 9/1984 Love
4,535,483 A 8/1985 Klawitter et al.
4,574,803 A 3/1986 Storz
4,592,340 A 6/1986 Boyles
4,605,407 A 8/1986 Black et al.
4,612,011 A 9/1986 Kautzky
4,629,459 A 12/1986 Ionescu et al.
4,643,732 A 2/1987 Pietsch et al.
4,655,771 A 4/1987 Wallsten
4,687,483 A 8/1987 Fisher et al.
4,692,164 A 9/1987 Dzemeshkevich et al.
4,733,665 A 3/1988 Palmaz
4,759,758 A 7/1988 Gabbay
4,777,951 A 10/1988 Cribier et al.
4,787,899 A 11/1988 Lazarus
4,787,901 A 11/1988 Baykut
4,796,629 A 1/1989 Grayzel
4,829,990 A 5/1989 Thuroff et al.
4,851,001 A 7/1989 Taheri
4,856,516 A 8/1989 Hillstead
4,878,495 A 11/1989 Grayzel
4,878,906 A 11/1989 Lindermann et al.
4,883,458 A 11/1989 Shiber
4,922,905 A 5/1990 Strecker
4,966,604 A 10/1990 Reiss
4,979,939 A 12/1990 Shiber
4,986,830 A 1/1991 Owens et al.
4,994,077 A 2/1991 Dobben
5,007,896 A 4/1991 Shiber
5,026,366 A 6/1991 Leckrone
5,032,128 A 7/1991 Alonso
5,037,434 A 8/1991 Lane
5,047,041 A 9/1991 Sammuels
5,080,668 A 1/1992 Bolz et al.
5,085,635 A 2/1992 Cragg
5,089,015 A 2/1992 Ross
5,152,771 A 10/1992 Sabbaghian et al.
5,163,953 A 11/1992 Vince
5,167,628 A 12/1992 Boyles
5,282,847 A 2/1994 Trescony et al.
5,295,958 A 3/1994 Shturman
5,332,402 A 7/1994 Teitelbaum
5,360,444 A 11/1994 Kusuhara
5,370,685 A 12/1994 Stevens
5,397,351 A 3/1995 Pavcnik et al.
5,411,055 A 5/1995 Anderson et al.
5,411,552 A 5/1995 Anderson et al.
5,443,446 A 8/1995 Shturman
5,480,424 A 1/1996 Cox
5,500,014 A 3/1996 Quijano et al.
5,545,209 A 8/1996 Roberts et al.
5,545,214 A 8/1996 Stevens
5,549,665 A 8/1996 Vesely
5,554,185 A 9/1996 Block et al.
5,571,175 A 11/1996 Vanney et al.
5,591,185 A 1/1997 Kilmer et al.
5,607,464 A 3/1997 Trescony et al.
5,609,626 A 3/1997 Quijano et al.
5,716,417 A 2/1998 Girard et al.
5,728,068 A 3/1998 Leone et al.
5,749,890 A 5/1998 Shaknovich
5,756,476 A 5/1998 Epstein
5,824,037 A 10/1998 Fogarty et al.
5,840,081 A 11/1998 Andersen et al.
5,855,597 A 1/1999 Jayaraman
5,855,601 A 1/1999 Bessler
5,855,602 A 1/1999 Angell
6,168,614 B1 1/2001 Andersen et al.
6,582,462 B1 6/2003 Andersen et al.
6,908,481 B2 6/2005 Cribier
7,585,321 B2 9/2009 Cribier
7,618,446 B2 11/2009 Andersen et al.
7,789,909 B2 9/2010 Andersen et al.
7,846,204 B2 * 12/2010 Letac et al. ................. 623/2.15
2001/0007956 A1 7/2001 Letac et al.
2001/0010017 A1 7/2001 Letac et al.
2003/0109924 A1 6/2003 Cribier
2005/0203616 A1 9/2005 Cribier
2008/0009940 A1 1/2008 Cribier
2008/0077236 A1 3/2008 Letac et al.

FOREIGN PATENT DOCUMENTS

DE 19532846 3/1997
DE 19546692 6/1997
EP 0103546 3/1984
EP 0144167 6/1985
EP 0592410 11/1991
GB 1268484 3/1972
GB 2056023 3/1981
SU 158988 5/1964
SU 1271508 11/1986
SU 1371700 2/1988
WO WO 91/17720 11/1991
WO WO 92/17118 10/1992
WO WO 93/01768 2/1993
WO WO 94/12136 6/1994
WO WO 96/40008 12/1996
WO WO 98/29057 7/1998
WO WO 99/33414 7/1999
WO W0 99/40964 8/1999
WO WO 99/47075 9/1999
WO WO 00/41652 7/2000
WO WO 00/47139 8/2000

OTHER PUBLICATIONS

Bailey, Steven R., "Percutaneous Expandable Prosthetic Valves", Textbook of Interventional Cardiology, 1994, vol. 2, Second Edition, W.B. Saunders Company, Philadelphia, PA, 11 Sheets.

Hourihan, et al., "Transcatheter Umbrella Closure of Valvular and Paravalvular Leaks," Journal of the American College of Cardiology, vol. 20, No. 6, pp. 1371 and 1374-1377, (1992).

Sugie, Waburo, M.D., et al., "Clinical Experience With Supported Homograft Heart Valve for Mitral and Aortic Valve Replacement," The Journal of Thoracic and Cardiovascular Surgery, vol. 57, No. 4, pp. 455-563, Apr. 1969.

Amendments to claims 33-49 from U.S. Appl. No. 09/795,803, filed Apr. 15, 2002 (pp. 1-3 ).

Claims 1-32 form U.S. Appl. No. 09/345,824, filed Jun. 30, 1999, (pp. 39-43).

Claims 33-49 from U.S. Appl. No. 09/795,803, filed Sep. 5, 2001, in response to Office Action of Jun. 5, 2001. (5 sheets ).

Extended European Search Report dated Nov. 25, 2009 from corresponding EP Case No. EP08016624.2.

Office Action from U.S. Appl. No. 09/795,803 mailed Sep. 25, 2002. (7 sheets).

Office Action from U.S. Appl. No. 09/345,824 mailed Aug. 29, 2000 ( pp. 2-8).

* cited by examiner



**U.S. Patent** Aug. 23, 2011 Sheet 1 of 18 US 8,002,825 B2

5
A
2
8
2a
1
2a
7
4
FIG_1a
5
A
A1
6
2
2a
6
1
2a
FIG_1b
5
A
2'
2a
1'
2a
3
4
FIG_1c

EDWARDS 00253025



U.S. Patent Aug. 23, 2011 Sheet 2 of 18 US 8,002,825 B2

10
I
11

FIG_2a

10
11
I

FIG_2b

EDWARDS 00253026

12
10
12

FIG_3a

12
10
12

FIG_3b



U.S. Patent Aug. 23, 2011 Sheet 4 of 18 US 8,002,825 B2

16
14
13
10
15
15
19

FIG_4a

13
16
14
17
10
15
18
19

FIG_4b

EDWARDS 00253028



U.S. Patent Aug. 23, 2011 Sheet 5 of 18 US 8,002,825 B2

X'
14
19
11
13
18
19
17
X

FIG_5a

13
19
14
18
10
19

FIG_5b

EDWARDS 00253029



FIG_7

FIG_6a

FIG_6b

FIG_6d

FIG_6c



U.S. Patent Aug. 23, 2011 Sheet 7 of 18 US 8,002,825 B2

14
17
19
18
A1

FIG_8a

10
11

FIG_8b

EDWARDS 00253031



U.S. Patent Aug. 23, 2011 Sheet 8 of 18 US 8,002,825 B2

X'
14
21
10
19
X

FIG_9a

14
10
21
19

FIG_9b

EDWARDS 00253032



U.S. Patent Aug. 23, 2011 Sheet 9 of 18 US 8,002,825 B2

14
22
10

FIG_10a

14
22
10

FIG_10b

EDWARDS 00253033



FIG_11a

FIG_11b

FIG_11c

FIG_11d

FIG_11e



U.S. Patent Aug. 23, 2011 Sheet 11 of 18 US 8,002,825 B2

11
29
30
27
26
19
14
18

FIG_12b

27
26
R
14
10
R
30

FIG_12a

EDWARDS 00253035



**U.S. Patent** Aug. 23, 2011 Sheet 12 of 18 US 8,002,825 B2

FIG_13c
27
R
26
30
R
27
FIG_13b
30
6
2'
1'
6
4
FIG_13a

EDWARDS 00253036



U.S. Patent Aug. 23, 2011 Sheet 13 of 18 US 8,002,825 B2

30
O
O
FIG_13f
26
O
O
FIG_13e
26
O
R
R
O
FIG_13d

EDWARDS 00253037



U.S. Patent Aug. 23, 2011 Sheet 14 of 18 US 8,002,825 B2

26
13
FIG_13i
26
13
FIG_13h
26
6
13
R
R
6
4
FIG_13g

EDWARDS 00253038



U.S. Patent Aug. 23, 2011 Sheet 15 of 18 US 8,002,825 B2

FIG_13l
FIG_13k
FIG_13j
26
6
13
R
R
6

EDWARDS 00253039

U.S. Patent Aug. 23, 2011 Sheet 16 of 18 US 8,002,825 B2

FIG_14

27
26
R
10
40
14
13
R
10'
26'

EDWARDS 00253040



U.S. Patent Aug. 23, 2011 Sheet 17 of 18 US 8,002,825 B2

2
26
10
1'
40
26'
FIG_15c
2a
2
2a
FIG_15b
2a
40
26
10
14
10'
26'
2a
FIG_15a

EDWARDS 00253041



**U.S. Patent** Aug. 23, 2011 Sheet 18 of 18 US 8,002,825 B2

26
26'
13
10
FIG_15f
13
10
26
26'
14
10'
FIG_15e
26
14
26'
10
FIG_15d

EDWARDS 00253042

# IMPLANTABLE PROSTHETIC VALVE FOR TREATING AORTIC STENOSIS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/942,690, filed Nov. 19, 2007, now U.S. Pat. No. 7,846,204, which is a continuation of U.S. patent application Ser. No. 11/110,402, filed Apr. 20, 2005, now abandoned, which is a continuation of U.S. patent application Ser. No. 10/139,741, filed May 2, 2002, now U.S. Pat. No. 6,908, 481, which is a continuation of U.S. patent application Ser. No. 09/795,803, filed Feb. 28, 2001, now abandoned, which in turn is a continuation of U.S. patent application Ser. No. 09/345,824, filed Jun. 30, 1999, now abandoned, which is a continuation of International application No. PCT/EP 97/07337, filed Dec. 31, 1997, which designates the United States and was published in English by the International Bureau on Jul. 9, 1998 as WO 98/29057, which claims priority to European application No. 96402929.2, filed Dec. 31, 1996, all of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to a valve prosthesis for implantation in body channels, more particularly but not only to, cardiac valve prosthesis to be implanted by a transcutaneous catheterization technique.

The valve prosthesis can be also applied to other body channels provided with native valves, such as veins or in organs (liver, intestine, urethra . . . ).

The present invention also relates to a method for implanting a valve prosthesis, such as the valve according to the present invention.

Implantable valves, which will be indifferently designated hereafter as "IV", "valve prosthesis" or "prosthetic valve", permits the reparation of a valvular defect by a less invasive technique in place of the usual surgical valve implantation which, in the case of valvular heart diseases, requires thoracotomy and extracorporeal circulation. A particular use for the IV concerns patients who cannot be operated on because of an associated disease or because of very old age or also patients who could be operated on but only at a very high risk.

Although the IV of the present invention and the process for implanting said IV can be used in various heart valve diseases, the following description will first concern the aortic orifice in aortic stenosis, more particularly in its degenerative form in elderly patients.

Aortic stenosis is a disease of the aortic valve in the left ventricle of the heart. The aortic valvular orifice is normally capable of opening during systole up to 4 to 6 $cm^2$, therefore allowing free ejection of the ventricular blood volume into the aorta. This aortic valvular orifice can become tightly stenosed, and therefore the blood cannot anymore be freely ejected from the left ventricle. In fact, only a reduced amount of blood can be ejected by the left ventricle which has to markedly increase the intra-cavitary pressure to force the stenosed aortic orifice. In such aortic diseases, the patients can have syncope, chest pain, and mainly difficulty in breathing. The evolution of such a disease is disastrous when symptoms of cardiac failure appear, since 50% of the patients die in the year following the first symptoms of the disease.

The only commonly available treatment is the replacement of the stenosed aortic valve by a prosthetic valve via surgery: this treatment moreover providing excellent results. If surgery is impossible to perform, i.e., if the patient is deemed inoperable or operable only at a too high surgical risk, an alternative possibility is to dilate the valve with a balloon catheter to enlarge the aortic orifice. Unfortunately, a good result is obtained only in about half of the cases and there is a high restenosis rate, i.e., about 80% after one year.

Aortic stenosis is a very common disease in people above seventy years old and occurs more and more frequently as the subject gets older. As evidenced, the present tendency of the general evolution of the population is becoming older and older. Also, it can be evaluated, as a crude estimation, that about 30 to 50% of the subjects who are older than 80 years and have a tight aortic stenosis, either cannot be operated on for aortic valve replacement with a reasonable surgical risk or even cannot be considered at all for surgery.

It can be estimated that, about 30 to 40 persons out of a million per year, could benefit from an implantable aortic valve positioned by a catheterization technique. Until now, the implantation of a valve prosthesis for the treatment of aortic stenosis is considered unrealistic to perform since it is deemed difficult to superpose another valve such an implantable valve on the distorted stenosed native valve without excising the latter.

From 1985, the technique of aortic valvuloplasty with a balloon catheter has been introduced for the treatment of subjects in whom surgery cannot be performed at all or which could be performed only with a prohibitive surgical risk. Despite the considerable deformation of the stenosed aortic valve, commonly with marked calcification, it is often possible to enlarge significantly the aortic orifice by balloon inflation, a procedure which is considered as low risk.

However, this technique has been abandoned by most physicians because of the very high restenosis rate which occurs in about 80% of the patients within 10 to 12 months. Indeed, immediately after deflation of the balloon, a strong recoil phenomenon often produces a loss of half or even two thirds of the opening area obtained by the inflated balloon. For instance, inflation of a 20 mm diameter balloon in a stenosed aortic orifice of 0.5 $cm^2$ area gives, when forcefully and fully inflated, an opening area equal to the cross sectional area of the maximally inflated balloon, i.e., about 3 $cm^2$. However, measurements performed a few minutes after deflation and removal of the balloon have only an area around 1 $cm^2$ to 1.2 $cm^2$. This is due to the considerable recoil of the fibrous tissue of the diseased valve. The drawback in this procedure has also been clearly shown on fresh post mortem specimens.

However, it is important to note that whereas the natural normal aortic valve is able to open with an orifice of about 5 to 6 $cm^2$ and to accommodate a blood flow of more that 15 l/min during heavy exercise for instance, an opening area of about 1.5 to 2 $cm^2$ can accept a 6 to 8 l/min blood flow without a significant pressure gradient. Such a flow corresponds to the cardiac output of the elderly subject with limited physical activity.

Therefore, an IV would not have to produce a large opening of the aortic orifice since an opening about 2 $cm^2$ would be sufficient in most subjects, in particular in elderly subjects, whose cardiac output probably does not reach more than 6 to 8 l/min during normal physical activity. For instance, the surgically implanted mechanical valves have an opening area which is far from the natural valve opening that ranges from 2 to 2.5 $cm^2$, mainly because of the room taken by the large circular structure supporting the valvular part of the device.

The prior art describes examples of cardiac valves prosthesis that are aimed at being implanted without surgical intervention by way of catheterization. For instance, U.S. Pat. No. 5,411,552 describes a collapsible valve able to be introduced

in the body in a compressed presentation and expanded in the right position by balloon inflation.

Such valves, with a semi-lunar leaflet design, tend to imitate the natural valve. However, this type of design is inherently fragile, and such structures are not strong enough to be used in the case of aortic stenosis because of the strong recoil that will distort this weak structure and because they would not be able to resist the balloon inflation performed to position the implantable valve. Furthermore, this valvular structure is attached to a metallic frame of thin wires that will not be able to be tightly secured against the valve annulus. The metallic frame of this implantable valve is made of thin wires like in stents, which are implanted in vessels after balloon dilatation. Such a light stent structure is too weak to allow the implantable valve to be forcefully embedded into the aortic annulus. Moreover, there is a high risk of massive regurgitation (during the diastolic phase) through the spaces between the frame wires which is another prohibitive risk that would make this implantable valve impossible to use in clinical practice.

Furthermore, an important point in view of the development of the IV is that it is possible to maximally inflate a balloon placed inside the compressed implantable valve to expand it and insert it in the stenosed aortic valve up to about 20 to 23 mm in diameter. At the time of maximum balloon inflation, the balloon is absolutely stiff and cylindrical without any waist. At that moment, the implantable valve is squeezed and crushed between the strong aortic annulus and the rigid balloon with the risk of causing irreversible damage to the valvular structure of the implantable valve.

## SUMMARY OF THE INVENTION

The invention is aimed to overcome these drawbacks and to implant an IV which will remain reliable for years.

A particular aim of the present invention is to provide an IV, especially aimed at being used in case of aortic stenosis, which structure is capable of resisting the powerful recoil force and to stand the forceful balloon inflation performed to deploy the IV and to embed it in the aortic annulus.

Another aim of the present invention is to provide an efficient prosthesis valve which can be implanted by a catheterization technique, in particular in a stenosed aortic orifice, taking advantage of the strong structure made of the distorted stenosed valve and of the large opening area produced by preliminary balloon inflation, performed as an initial step of the procedure.

A further aim of the present invention is to provide an implantable valve which would not produce any risk of fluid regurgitation.

A further aim of the present invention is to provide a valve prosthesis implantation technique using a two-balloon catheter and a two-frame device.

These aims are achieved according to the present invention which provides a valve prosthesis of the type mentioned in the introductory part and wherein said valve prosthesis comprises a collapsible continuous structure with guiding means providing stiffness and a frame to which said structure is fastened, said frame being strong enough to resist the recoil phenomenon of the fibrous tissue of the diseased valve.

The IV, which is strongly embedded, enables the implantable valve to be maintained in the right position without any risk of further displacement, which would be a catastrophic event.

More precisely, this valvular structure comprises a valvular tissue compatible with the human body and blood, which is supple and resistant to allow said valvular structure to pass from a closed state to an open state to allow a body fluid, more

particularly the blood, exerting pressure on said valvular structure, to flow. The valvular tissue forms a continuous surface and is provided with guiding means formed or incorporated within, creating stiffened zones which induce the valvular structure to follow a patterned movement from its open position to its closed state and vice-versa, providing therefore a structure sufficiently rigid to prevent diversion, in particular into the left ventricle and thus preventing any regurgitation of blood into the left ventricle in case of aortic implantation.

Moreover, the guided structure of the IV of the invention allows the tissue of this structure to open and close with the same patterned movement while occupying as little space as possible in the closed state of the valve. Therefore, owing to these guiding means, the valvular structure withstands the unceasing movements under blood pressure changes during the heart beats.

More preferably, the valvular structure has a substantially truncated hyperboloidal shape in its expanded position, with a larger base and a growing closer neck, ending in a smaller extremity forming the upper part of the valvular structure. The valvular structure has a curvature at its surface that is concave towards the aortic wall. Such a shape produces a strong and efficient structure in view of the systolo-diastolic movement of the valvular tissue. Such a valvular structure with its simple and regular shape also lowers the risk of being damaged by forceful balloon inflation at the time of IV deployment.

A trunco-hyperboloidal shape with a small diameter at the upper extremity facilitates the closure of the valve at the beginning of diastole in initiating the starting of the reverse movement of the valvular tissue towards its base. Another advantage of this truncated hyperboloidal shape is that the upper extremity of the valvular structure, because of its smaller diameter, remains at a distance from the coronary ostia during systole as well as during diastole, thus offering an additional security to ensure not to impede at all the passage of blood from the aorta to the coronary ostia.

As another advantageous embodiment of the invention, the guiding means of the valvular structure are inclined strips from the base to the upper extremity of the valvular structure with regard to the central axis of the valvular structure. This inclination initiates and imparts a general helicoidal movement of the valvular structure around said central axis at the time of closure or opening of said structure, such a movement enabling to help initiate and finalize the closure of the valvular structure. In particular, this movement improves the collapse of the valvular structure towards its base at the time of diastole and during the reversal of flow at the very beginning of diastole. During diastole, the valvular structure thus fails down, folding on itself and collapses on its base, therefore closing the aortic orifice. The strips can be pleats, strengthening struts or thickened zones.

In other embodiments, said guiding means are rectilinear strips from the base to the upper extremity of the valvular structure. In this case, the guiding means can comprise pleats, struts or thickened zones. In a particular embodiment, the stiffened zones then created can be advantageously two main portions, trapezoidal in shape, formed symmetrically one to each other with regard to the central axis of the valvular structure, and two less rigid portions separating said two main portions to lead to a tight closeness in shape of a closed slot at the time of closure of the upper extremities of the main portions of the valvular structure. The thickened zones can be extended up to form the stiffened zones.

More particularly, each of said main slightly rigid portions occupy approximately one third of the circumference of the

valvular structure when this latter is in its open position. The slightly rigid portions maintain the valvular structure closed during diastole by firmly applying themselves on each other. The closure of the valvular structure at the time of diastole thus does not have any tendency to collapse too much towards the aortic annulus.

Preferably, the guiding means are a number of pleats formed within the tissue by folding, or formed by recesses or grooves made in the tissue. The shape of the pleats is adapted to achieve a global shape of the desired type for said position.

Alternatively, the guiding means are made of strengthening struts, preferably at least three, incorporated in the tissue in combination or not with said pleats.

The guiding means and, in particular, the strengthening struts, help to prevent the valvular tissue from collapsing back too much and to reverse inside the left ventricle through the base of the frame, preventing the risk of blood regurgitation.

In a preferred prosthetic valve of the invention, said valvular tissue is made of synthetic biocompatible material such as TEFLON® or DACRON®, polyethylene, polyamide, or made of biological material such as pericardium, porcine leaflets and the like. These materials are commonly used in cardiac surgery and are quite resistant, particularly to folding movements due to the increasing systolo-diastolic movements of the valvular tissue and particularly at the junction with the frame of the implantable valve.

The valvular structure is fastened along a substantial portion of an expandable frame, by sewing, by molding or by gluing to exhibit a tightness sufficiently hermetical to prevent any regurgitation of said body fluid between the frame and the valvular structure.

Preferably, an internal cover is coupled or is integral to the valvular structure and placed between said valvular structure and the internal wall of the frame to prevent any passage of the body fluid through said frame. Therefore, there is no regurgitation of blood as it would be the case if there were any space between the valvular structure fastened on the frame and the zone of application of the frame on the aortic annulus. The internal cover makes a sort of "sleeve" at least below the fastening of the valvular structure covering the internal surface of the frame and thus prevents any regurgitation of blood through the frame.

In the present invention, the frame is a substantially cylindrical structure capable of maintaining said body channel open in its expanded state and supporting said collapsible valvular structure.

In a preferred embodiment of the invention, the frame is made of a material which is distinguishable from biological tissue to be easily visible by non invasive imaging techniques.

Preferably, said frame is a stainless metal structure or a foldable plastic material, made of intercrossing, preferably with rounded and smooth linear bars. This frame is strong enough to resist the recoil phenomenon of the fibrous tissue of the diseased valve. The size of the bars and their number are determined to give both the maximal rigidity when said frame is expanded and the smallest volume when the frame is compressed.

More preferably, the frame has projecting curved extremities and presents a concave shape. This is aimed at reinforcing the embedding and the locking of the implantable valve in the distorted aortic orifice.

In a preferred embodiment of the present invention, the IV is made in two parts, a first reinforced frame coupled with a second frame which is made of thinner bars than said first frame and which is embedded inside the second frame. This second frame to which the valvular structure is fastened as described above, is preferably less bulky than the first frame to occupy as little space as possible and to be easily expanded using low pressure balloon inflation.

The present invention also relates to a double balloon catheter to separately position the first frame in the dilated stenosed aortic valve and place the second frame that comprises the valvular structure. This catheter comprises two balloons fixed on a catheter shaft and separated by few centimeters.

The first balloon is of the type sufficiently strong to avoid bursting even at a very high pressure inflation and is aimed at carrying, in its deflated state, a strong frame aimed at scaffolding the previously dilated stenosed aortic valve. The second balloon is aimed at carrying the second frame with the valvular structure.

An advantage of this double balloon catheter is that each balloon has an external diameter which is smaller than known balloons since each element to be expanded is smaller.

Moreover, such a double balloon catheter allows to enlarge the choice for making an efficient valvular structure enabling to overcome the following two contradictory conditions:

1) having a soft and mobile valvular structure capable of opening and closing freely in the blood stream, without risk of being damaged by balloon inflation; and
2) needing a very strong structure able to resist the recoil force of the stenosed valve and capable of resisting, without any damage, a strong pressure inflation of the expanding balloon.

Furthermore, the shaft of said double balloon catheter comprises two lumens for successive and separate inflation of each balloon. Of note, an additional lumen capable of allowing a rapid inflation takes additional room in the shaft.

The invention also relates to a method of using a two-balloon catheter with a first frame and second frame to which a valve prosthesis of the type previously described is fastened.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will now be explained and other advantages and features will appear with reference to the accompanying schematical drawings wherein:

FIGS. **1***a*, **1***b* and **1***c* illustrate, in section views, respectively, the normal aortic valve in systole, in diastole and a stenosed aortic valve;

FIGS. **2***a* and **2***b* illustrate two examples of a metallic frame which are combined to a valvular structure according to the present invention;

FIGS. **3***a* and **3***b* illustrate a frame according to the invention in its expanded position with an opening out of the extremities, respectively, with a cylindrical and a concave shape;

FIGS. **4***a* and **4***b* illustrate an IV of the invention respectively in its compressed position and in its expanded position in an open position as in systole;

FIGS. **5***a* and **5***b* illustrate respectively an IV of the invention in its closed position and a sectional view according to the central axis of such a valvular structure which is closed as in diastole;

FIGS. **6***a* to **6***d* illustrate a sectional view according to the central axis of an IV according to the present invention and showing the internal cover and the external cover of the valvular structure overlapping partially or non overlapping the frame bars;

FIG. **7** illustrates the frontal zig-zag fastening line of the valvular tissue on the frame;

FIGS. **8***a* and **8***b* illustrate, respectively, a perspective view of a valvular structure and an internal cover made all of one

piece and a perspective view of the corresponding frame into which they will be inserted and fastened;

FIGS. 9*a* and 9*b* illustrate inclined strengthening struts, an example of a valvular structure according to the invention, respectively in the open position and in the closed position;

FIGS. **10***a* and **10***b* illustrate an example of a valvular structure comprising pleats, respectively in the open and in the closed position;

FIGS. **11***a* and **11***b* illustrate a valvular structure comprising two trapezoidal slightly rigid portions, respectively in the open and in the closed position;

FIGS. **11***c* to **11***e* illustrate a valvular structure comprising a rectangular stiffened zone, respectively in the open, intermediate and closed position;

FIGS. **12***a* and **12***b* illustrate, respectively, a perspective and cross sectional views of an implantable valve in its compressed presentation squeezed on a balloon catheter;

FIGS. **13***a* to **13***l* illustrate views of the successive procedure steps for the IV implantation in a stenosed aortic orifice;

FIG. **14** illustrates an implantable valve made in two parts in its compressed presentation squeezed on a two-balloon catheter with a reinforced frame on a first balloon and with the implantable valve on the second balloon; and

FIGS. **15***a* to **15***f* illustrate the successive steps of the implantation of the implantation valve in two parts with a two-balloon catheter.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the diastole and systole illustrations of section views of FIGS. **1***a* and **1***b*, the arrows A indicates the general direction of the blood flow. The semi-lunar leaflets **1** and **2** of a native aortic valve (with only two out of three shown here) are thin, supple and move easily from the completely open position (systole) to the closed position (diastole). The leaflets originate from an aortic annulus **2***a*.

The leaflets **1'** and **2'** of a stenosed valve as illustrated in FIG. **1***c*, are thickened, distorted, calcified and more or less fused, leaving only a small hole or a narrow slit **3**, which makes the ejection of blood from the left ventricle cavity **4** into the aorta **5** difficult and limited. FIGS. **1***a* to **1***c* show also the coronary artery ostium **6***a* and **6***b* and FIG. **1***a* shows, in particular, the mitral valve **7** of the left ventricle cavity **4**.

An implantable valve according to the invention essentially comprises a supple valvular structure supported by a strong frame. The positioning of the implantable valve is an important point since the expanded frame has to be positioned exactly at the level of the native valvular leaflets **1**, **2** of the native valve, the structures of which are pushed aside by the inflated balloon.

Ideally, the implantable valve is positioned with the fastening line of the valvular structure on the frame exactly on the remains of the crushed stenosed valve to prevent any regurgitation of blood. In practice, it is difficult to position the implantable valve within less than 2 or 3 mm. However, any risk of regurgitation of blood is eliminated with the presence of an internal cover, as will be described below.

The upper limit of the frame should be placed below the opening of the coronary arteries, i.e., the coronary ostia **6**, or at their level so that the frame does not impede free blood flow in the coronary arteries. This point is a delicate part of positioning an IV since the distance between the superior limit of the leaflets of the natural valve and the coronary ostia **6** is only about 5 to 6 mm. However, the ostia are located in the Valsalva sinus **8** which constitutes a hollow that are located a little out of the way. This helps to prevent from impeding the coronary blood flow by the IV.

At the time of implantation, the operator evaluates the exact positioning of the coronary ostia by looking at the image produced by a sub-valvular angiogram with contrast injection performed before the implantation procedure. This image will be fixed in the same projection on a satellite TV screen and will permit the evaluation of the level of the origin of the right and left coronary arteries. Possibly, in case the ostia are not clearly seen by sub-valvular angiography, a thin guide wire, as those used in coronary angioplasty, is positioned in each of the coronary arteries to serve as a marker of the coronary ostia.

The lower part of the frame of the IV preferably extends by 2 or 3 mm inside the left ventricle **4**, below the aortic annulus **2***a*. However, this part of the frame should not reach the insertion of the septal leaflet of the mitral valve **7**, so that it does not interfere with its movements, particularly during diastole.

FIGS. **2***a* and **2***b* show respectively an example of a cylindrical frame or stent **10** comprising intercrossing linear bars **11**, with two intersections I by bar **11**, the bars **11** being soldered or provided from a folded wire to constitute the frame, with for instance a 20 mm, 15 mm or 12 mm height, and an example with only one intersection of bars **11**. Preferably, such a frame is expandable from a size of about 4 to 5 millimeters to a size of about 20 to 25 mm in diameter, or even to about 30-35 mm (or more) in particular cases, for instance for the mitral valve. Moreover, said frame, in its fully expanded state, has a height of approximately between 10 and 15 mm and in its fully compressed frame, a height of approximately 20 mm. The number and the size of the bars are adapted to be sufficiently strong and rigid when the frame is fully open in the aortic orifice to resist the strong recoil force exerted by the distorted stenosed aortic orifice after deflation' of the balloon used in the catheterization technique which has been previously maximally inflated to enlarge the stenosed valve orifice.

The frame may have several configurations according to the number of bars **11** and intersections. This number, as well as the size and the strength of the bars **11**, are calculated taking into account all the requirements described, i.e., a small size in its compressed form, its capacity to be enlarged up to at least 20 mm in diameter and being strong when positioned in the aortic orifice to be able to be forcefully embedded in the remains of the diseased aortic valve and to resist the recoil force of the aortic annulus. The diameter of the bars is chosen, for instance, in the range of 0.1-0.6 mm.

A frame particularly advantageous presents, when deployed in its expanded state, an opening out **12** at both extremities as shown in FIGS. **3***a* and **3***b*, the frame having a linear profile (FIG. **3***a*) or a concave shape profile (FIG. **3***b*). This is aimed at reinforcing the embedding of the IV in the aortic orifice. However, the free extremities of the openings **12** are rounded and very smooth to avoid any traumatism of the aorta or of the myocardium.

The structure of a preferred frame used in the present invention both maintains the aortic orifice fully open once dilated and produces a support for the valvular structure. The frame is also foldable. When folded by compression, the diameter of said frame is about 4 to 5 millimeters, in view of its transcutaneous introduction in the femoral artery through an arterial sheath of 14 to 16 F (F means French, a unit usually used in cardiology field) i.e., about 4.5 to 5.1 mm. Also, as described below, when positioned in the aortic orifice, the

frame is able to expand under the force of an inflated balloon up to a size of 20 to 23 mm in diameter.

The frame is preferably a metallic frame, preferably made of steel. It constitutes a frame with a grate type design able to support the valvular structure and to behave as a strong scaffold for the open stenosed aortic orifice.

When the frame is fully expanded, its intercrossing bars push against the remains of the native stenosed valve that has been crushed aside against the aortic annulus by the inflated balloon. This produces a penetration and embeds the bars within the remains of the stenosed valve, in particular owing to a concave profile of the frame provided with an opening out, as illustrated in FIG. 3*b*. This embedding of the frame on the aortic annulus, or more precisely on the remains of the crushed distorted aortic valve, will be determinant for the strong fixation of the IV in the right position, without any risk of displacement.

Moreover, the fact that the valve leaflets in degenerative aortic stenosis are grossly distorted and calcified, sometimes leaving only a small hole or a small slit in the middle of the orifice, has to be considered an advantage for the implantation of the valve and for its stable positioning without risk of later mobilization. The fibrous and calcified structure of the distorted valve provides a strong base for the frame of the IV and the powerful recoil phenomenon that results from elasticity of the tissues contribute to the fixation of the metallic frame.

The height of the fully expanded frame of the illustrated frames **10** is preferably between 10 and 15 mm. Indeed, since the passage from the compressed state to the expanded state results in a shortening of the metallic structure, the structure in its compressed form is a little longer, i.e., preferably about 20 mm length. This does not constitute a drawback for its transcutaneous introduction and its positioning in the aortic orifice.

As mentioned above, the frame is strong enough to be able to oppose the powerful recoil force of the distended valve and of the aortic annulus **2***a*. Preferably it does not possess any flexible properties. When the frame has reached its maximal expanded shape under the push of a forcefully inflated balloon, it remains substantially without any decrease in size and without any change of shape. The size of the bars that are the basic elements of the frame is calculated in such a way to provide a substantial rigidity when the frame is fully expanded. The size of the bars and their number are calculated to give both maximal rigidity when expanded and the smallest volume when the metallic frame is its compressed position.

At the time of making the IV, the frame is expanded by dilatation to its broadest dimension, i.e., between 20 mm and 25 mm in diameter, so as to be able to fasten the valvular structure on the inside side of its surface. This fastening is performed using the techniques in current use for the making of products such as other prosthetic heart valves or multipolars catheters etc. Afterwards, it is compressed in its minimal size, i.e., 4 or 5 mm, in diameter in view of its introduction in the femoral artery. At time of the IV positioning, the frame is expanded again by balloon inflation to its maximal size in the aortic orifice.

If the frame is built in an expanded position, it will be compressed, after fastening the valvular structure, by exerting a circular force on its periphery and/or on its total height until obtaining the smallest compressed position. If the frame is built in its compressed position, it will be first dilated, for instance, by inflation of a balloon and then compressed again as described above.

To help localizing the IV, the frame being the only visible component of the valve, the shaft of the balloon catheter on which will be mounted the IV before introduction in the body (see below) possesses preferentially metallic reference marks easily seen on fluoroscopy. One mark will be at level of the upper border of the frame and the other at the level of the lower border. The IV, when mounted on the catheter shaft and crimpled on it, is exactly positioned taking into account these reference marks on the shaft.

Accordingly, the frame is visible during fluoroscopy when introduced in the patient's body. When the frame is positioned at the level of the aortic annulus, the upper border of the frame is placed below the coronary ostia. Furthermore, the implanting process during which the balloon inflation completely obstructs the aortic orifice, as seen below, is performed within a very short time, i.e., around 10 to 15 seconds. This also explains why the frame is clearly and easily seen, without spending time to localize it. More particularly, its upper and lower borders are clearly delineated.

FIGS. **4***a* and **4***b* show an example of a preferred IV **13** of the present invention, respectively in its compressed position, in view of its introduction and positioning in the aortic orifice, and in its expanded and opened (systole) position. FIGS. **5***a* and **5***b* show the expanded position of this example closed in diastole, respectively in perspective and in a crossed section view along the central axis XX of the valve prosthesis.

The valvular structure **14** is compressed inside the frame **10** when this is in its compressed position (FIG. **4***a*), i.e., it fits into a 4 to 5 mm diameter space. On the other hand, the valvular structure can expand (FIG. **4***b*) and follow the frame expansion produced by the inflated balloon. It will have to be able to reach the size of the inside of the fully deployed frame.

The illustrated IV **13** is made of a combination of two main parts:

1) the expandable but substantially rigid structure made of the frame **10**, a metallic frame in the example; and
2) a soft and mobile tissue constituting the valvular structure **14** exhibiting a continuous surface truncated between a base **15** and an upper extremity **16**; the tissue is fastened to the bars **11** of the frame at its base **16** and is able to open in systole and to close in diastole at its extremity **16**, as the blood flows in a pulsatile way from the left ventricle towards the aorta.

The tissue has rectilinear struts **17** incorporated in it in plane including the central axis XX, in order to strengthen it, in particular, in its closed state with a minimal occupation of the space, and to induce a patterned movement between its open and closed state. Other examples of strengthening struts are described below. They are formed from thicker zones of the tissue or from strips of stiffening material incorporated in the tissue; they can also be glued or soldered on the valvular tissue.

These strengthening struts help to prevent the valvular tissue from collapsing back too much and to evert inside the left ventricle through the base of the frame. These reinforcements of the valvular tissue help maintain the folded tissue above the level of the orifice during diastole, prevent too much folding back and risk of inversion of the valvular structure inside the left ventricle. By also preventing too much folding, a decrease of the risk of thrombi formation can also be expected by reducing the number of folds.

The truncated shape forming a continuous surface enables to obtain a strong structure and is more efficient for the systolo-diastolic movements of the valvular tissue during heart beats. The truncoidal shape facilitates the closure of the valve structure at the beginning of diastole in facilitating the start of the reverse movement of the valvular tissue towards its base at the time of diastole, i.e., at the time of flow reversal at the very beginning of diastole. During diastole, the valvular structure **14** thus fails down, folding on itself, thereby col-

lapsing on its base, and therefore closing the aortic orifice. In fact, the valvular structure has preferably, as illustrated, an hyperboloid shape, with a curvature on its surface concave towards the aortic wall that will contribute to initiating its closure.

Moreover, the basis of the truncated hyperboloid is fixed on the lower part of a frame and the smallest extremity of the truncated hyperboloid is free in the blood stream, during the respected closing and opening phases.

An important advantage of this hyperboloidal shape is that the upper extremity **16** of the valvular structure **14** can remain at a distance from the coronary ostia during systole as well as during diastole, because of its smaller diameter, thus offering an additional security to make certain that the passage of blood from aorta to the coronary ostia is not impeded.

The base **15** of the truncated tissue is attached on the frame **10** along a line of coupling **18** disposed between the inferior fourth and the third fourth of the frame in the example. The upper extremity **16**, with the smaller diameter, overpasses the upper part of the frame by a few millimeters; 6 to 8 mm, for instance. This gives the valvular structure a total height of about 12 to 15 mm.

The upper extremity **16** of the truncated tissue, i.e., the smaller diameter of the hyperboloidal structure **14**, is about 17 to 18 mm in diameter (producing a 2.3 to 2.5 $cm^2$ area opening) for a 20 mm diameter base of the truncated structure, or 19 to 20 mm in diameter (producing a 2.8 or a 3 $cm^2$ area opening) for a 23 mm diameter base. An opening area around 2 $cm^2$ or slightly above, gives satisfactory results, particularly in elderly patients who would not reasonably need to exert high cardiac output.

For instance, in the present example, the line of fastening of the base of the truncated tissue on the frame will have to expand from a 12.5 mm perimeter (for a 4 mm external diameter of the compressed IV) to a 63 mm perimeter (for a 20 mm external diameter of the expanded IV), or to a 72 mm perimeter (for a 23 mm external diameter, in case a 23 mm balloon is used).

Another advantage of this truncated continuous shape is that it is stronger and has less risk of being destroyed or distorted by the forceful balloon inflation at the time of IV deployment. Also, if the truncated hyperboloidal shape is marked, for instance, with a 16 or 17 mm diameter of the upper extremity as compared to a 20 mm diameter of the base (or 18 to 20 mm for 23 mm), the smaller upper part is compliant during balloon inflation in order to enable the balloon to expand cylindrically to its maximal mm diameter (or 23 mm). This is made possible by using a material with some elastic or compliant properties.

The valvular structure of the invention, as shown in the illustrated example, includes advantageously a third part, i.e., the internal cover **19** to be fixed on the internal wall of the frame **10**. This internal cover prevents any passage of blood through the spaces between the bars **11** of the frame in case the implantable valve would be positioned with the fastening line of the valvular structure on the frame not exactly on the remains of the dilated aortic valve, i.e., either above or below. It also strengthens the fastening of the valvular structure **14** to the frame **10**.

In the different sectional views of the different examples of IV according to the invention, as illustrated at FIGS. **6***a* to **6***c*, the internal cover **19** covers the totality of the internal side of the frame **10** (FIG. **6***a*), only the lower part of the frame **10** (FIG. **6***b*), or it can additionally cover partially 3 to 5 mm as shown in the passage of blood from aorta to the coronary ostia FIG. **6***c*, the upper part defined above the coupling line **18** of the valvular structure.

For instance, such an extension of the internal cover **19** above the fastening line **18** of the valvular structure will give another security to avoid any risk of regurgitation through the spaces between the bars **11** in case the IV would be positioned too low with respect to the border of the native aortic valve.

The internal cover can also be molded to the valvular structure or casted to it which therefore constitutes an integral structure. The valvular structure and the internal cover are therefore strongly locked together with minimum risk of detachment of the valvular structure which is unceasingly in motion during systole and diastole. In that case, only the internal cover has to be fastened on the internal surface of the frame which renders the making of the IV easier and makes the complete device stronger and more resistant. In particular, the junction of the mobile part of the valvular structure and the fixed part being molded as one piece is stronger and capable to face the increasing movements during the systolo-diastolic displacements without any risk of detachment.

The presence of the internal cover makes an additional layer of plastic material that occupies the inside of the frame and increases the final size of the IV. Therefore, in the case in which the internal cover is limited to the inferior part of the frame (that is, below the fastening line of the valvular structure), it does not occupy any additional space inside the frame. Here also, it is more convenient and safer to make the valvular structure and this limited internal cover in one piece.

In other aspects, to prevent any regurgitation of blood from the aorta towards the left ventricle during diastole, the base of the valvular structure is preferably positioned exactly at the level of the aortic annulus against the remains of distorted stenosed valve pushed apart by the inflated balloon. Therefore, there is no possibility of blood passage through the spaces between the metallic frame bars **11** below the attachment of the valvular structure.

However, to avoid any risk of leaks, the part of the frame below the fastening of the valvular structure (about 3 to 5 mm) is preferably covered by an internal cover which is preferably made with the same tissue as the valvular structure. Thus, there would be no regurgitation of blood which is a possibility when there is any space between the valvular structure fastened on the metallic frame and the line of application of the frame on the aortic annulus. The internal cover makes a sort of "sleeve" below the fastening of the valvular structure on the internal surface of the frame, covering the spaces between the frame bars of the frame at this level, thus preventing any regurgitation of blood through these spaces.

The internal cover can also have another function, i.e., it can be used to fasten the valvular structure inside the frame, as described below.

At FIG. **6***d*, the internal cover **19** is extended at its lower end **19'** to an external cover **19'** which is rolled up to be applied on the external wall of the stent **10**. The internal and external cover are molded, glued or soldered to the bars of the stent **10**.

The coupling process of the valvular structure on the frame is of importance since it has to be very strong without any risk of detachment of the valvular structure from the frame during millions of heart beats with pulsatile blood flow alternatively opening and closing the valvular structure.

The valvular structure of the invention folds to a very small size inside the frame in the compressed position of the valve and is expandable up to 20 to 23 mm diameter. Also, the valvular structure can resist the strong force exerted by the maximally inflated balloon that will powerfully squeeze it against the bars of the frame or against the internal cover, this one being squeezed directly against the bars of the frame. The junction zone is also particularly subjected to very strong pressure exerted by the inflated balloon. Furthermore, this

junction zone must not tear or break off during expansion of the balloon. At this time, each part of the junction zone is squeezed against the bars but nonetheless follows the expansion of the frame.

As shown in FIG. **7**, the junction zone is, for example, a fastening line **20** which follows the design of a "zig-zag" line drawn by the intercrossing bars **11** of the frame on the internal cover **19**.

The fastening of the valvular structure to the frame can be made by sewing the internal and/or the external cover to the bars. To prevent any leakage of blood, stitches are preferably numerous and very close to each other, either as separated stitches or as a continuous suture line. Also, the stitches are made directly around the bars **11**. Furthermore, since the valvular structure is expanded together with the metallic frame, the stitches, if made as a continuous suture line, are also able to expand at the same time.

The fastening process can also be made by molding the base of the valvular structure on the frame. At this level, the bars **11** are imbedded in the coupling line of the valvular structure **14**. This mold way also concerns the internal cover **19**, when it goes below the coupling line **14** on the frame over few millimeters, for example, 2 to 4 mm. As mentioned above, this is intended in order to prevent any regurgitation of blood just below the lower part of the valvular structure **14** in case the frame **10** would not be exactly positioned on the aortic annulus but at few millimeters away.

The fastening process can further be made by gluing or soldering the valvular structure on the bars with sufficiently powerful biocompatible glues. The same remark can be made concerning the internal cover of the frame below the coupling line of the valvular structure.

Also, this allows the coupling line to follow the frame changes from the compressed position to its expanded one.

The valvular structure can also be fastened on the internal cover previously fixed at the total length of the internal surface of the metallic frame. The internal cover constitutes therefore a surface on which any type of valvular structure be more easily sewed, molded or glued. Because it is a structure with a large surface and is not involved in the movements of the valvular tissue during systole and diastole, the internal cover is more easily fastened to the internal surface of the frame.

In the particular embodiment shown in FIGS. **8***a* and **8***b*, the internal cover **19** is fastened, after introduction (indicated by the arrow B), at the upper and lower extremities of the frame **10** on the upper and lower zig-zag lines of the intercrossing bars **11**. In fact, the fastening of the internal cover **19** on the zig-zag lines made by the intercrossing bars **11** of the frame allows an easier passage of blood from the aorta above the IV towards the coronary ostia. Indeed, the blood can find more space to flow into the coronary ostia by passing through the lowest point of each triangular space made by two intercrossing bars **11**, as indicated by the arrows A1 (see also FIG. **1***b*).

The fastening of the internal cover **19** on the extremities can be reinforced by various points of attachment on various parts of the internal surface of the frame **10**. The internal cover **19** can be fastened by sewing, molding or gluing the bars **11** onto the frame.

Fastening the valvular tissue (and the cover tissue below) on the inside of the frame, requires work on the frame in its expanded position to have access to the inside of this cylindric frame. In a preferred embodiment the frame is expanded a first time for fastening the valvular tissue on its bars, then compressed back to a smaller size to be able to be introduced via arterial introducer and finally expanded again by the balloon inflation.

Since it is aimed at being positioned in the heart after having been introduced by a catheterization technique by a transcutaneous route in a peripheral artery, mainly the femoral artery, the IV should preferably have the smallest possible external diameter. Ideally, it should be able to be introduced in the femoral artery through a 14 F (4.5 mm) size arterial introducer which is the size of the arterial introducer commonly used to perform an aortic dilatation. However, a 16 F (5.1 mm) or even a 18 F (5.7 mm) introducer would also be acceptable.

Above this size, the introduction of the IV in the femoral artery should probably be done by a surgical technique. This is still quite acceptable since the surgical procedure would be a very light procedure which could be done by a surgeon with a simple local anaesthesia. It has to be recalled that this technique is used to position big metallic frames, about 24 F in size (7.64 mm in diameter), in the abdominal aorta for the treatment of aneurysms of the abdominal aorta. In that situation, this necessitates surgical repair of the artery after withdrawal of the sheath (M. D. Dake, New Engl. J. Med. 1994; 331:1729-34).

Ideally, an IV should be able to last several tenths of life years without defect, like the mechanical prosthetic valves which are currently implanted by the surgeons. Nevertheless, an implantable valve that would last at least ten years without risk of deterioration would be effective for the treatment of elderly patients.

A valvular structure according to the invention is made of a supple and reinforced tissue which has a thickness to be thin enough to occupy as less as possible space in the compressed form of the valve, is pliable, and also strong enough to stand the unceasing movements under the blood pressure changes during heart beats. The valvular structure is capable of moving from its closed position to its open position under the action of the force exerted by the movements of the blood during systole and diastole, without having any significant resistance to blood displacements.

The material used for the tissue, which exhibits the above mentioned requirements, may be TEFLON® or DACRON®, which are quite resistant to folding movements, at least when they are used to repair cardiac defects such as inter-atrial or interventricular defects or when they are used to repair a valve such as the mitral valve which is subjected to high pressure changes and movements during heart beats. Also, a main point is the increasing systolo-diastolic movements of the valvular tissue, particularly at its junction with the rigid part of the IV, and it is therefore necessary to find the most possible resistant material tissue.

As mentioned previously, the valvular structure can also possibly be made with biological tissue such as the pericardium, or with porcine leaflets, which are commonly used in bioprosthetic surgically implanted valves.

Moreover, the valvular prosthesis of the present invention does not induce any significant thrombosis phenomenon during its stay in the blood flow and is biologically neutral.

To prevent the risk of thrombus formation and of emboli caused by clots, a substance with anti-thrombic properties could be used, such as heparine, ticlopidine, phosphorylcholine, etc., either as a coating material or it can be incorporated into the material used for the implantable valve, in particular, for the valvular structure and/or for the internal cover.

The valvular structure of the invention can have several types of designs and shapes. Besides the example illustrated in FIGS. **4** and **5**, examples of strengthened valvular struc-

tures according to the invention are shown in FIGS. **9** to **11**, respectively in the closed (FIGS. **9***a*, **10***a*, **11***a*) and in the open state (FIGS. **9***b*, **10***b*, **11***b*) to form a prosthetic valve according to the present invention. In those figures, the frame line is simplified to clarify the drawings.

To help initiate and finalize the closure of the valvular structure, four strengthening struts **14***a* are slightly inclined from the base to the upper part as compared to the central axis XX of the structure, as shown in FIGS. **9***a* and **9***b*. Accordingly, a patterned movement of the valvular structure, during the closing and the opening phases, is initiated. This patterned movement is, in the present case, a helicoidal-type one, as suggested in FIGS. **9***b* and **10***b* by the circular arrow **21**.

FIGS. **10***a* and **10***b* illustrate another embodiment to help the closing of the valvular structure and which also involves a helicoidal movement. Represented by lines **22**, inclined pleats are formed in the tissue to impart such a movement. As illustrated, these lines have an inclination from the base to the upper part of the valvular structure tissue **14**. Pleats are formed by folding the tissue or by alternating thinner and thicker portions. The width and the number of those pleats are variable, and depend particularly on the type of material used. According to another example, these pleats **22** are combined with the above described inclined strengthening struts.

These reinforcing pleats and/or struts, rectilinear or inclined, have the advantage to impart a reproducible movement and, accordingly, to avoid the valvular structure from closing to a nonstructurized collapse on the frame base.

Another shape of the valvular structure comprises two portions: one portion being flexible but with some rigidity, having a rectangular shape, occupying about one third of the circumference of the valvular structure, and the other portion being more supple, flexible and foldable occupying the rest of the circumference at its base as well as at its upper, free border. According to FIG. **11***c*, this valve is opened, during the ejection of blood, i.e., during systol. In FIG. **11***d*, a front view of the valve is closed, during an intermediate diastole, and in FIG. **11***e* the same closed valve during diastole is shown from a side view. The semi-rigid part **24'** moves little during systole and during diastole. The foldable part **23'** moves away from the rigid part during systole to let the blood flow through the orifice thus made. This orifice, due to the diameter of the upper part which is the same as that of the open stent, is large, generally as large as that of the open stent. At the time of diastole, due to the reverse of pressure, the foldable part moves back towards the semi-rigid part and presses on it, and thus closes the orifice and prevents any regurgitation of blood.

The advantage of such a valve design is to allow a large opening of the upper part of the valvular structure, not only to permit more blood flow at time of systole after the valve has been implanted, but also at the very time of implantation, when the balloon is maximally inflated to expand the valve to imbed it in the valvular annulus. The diameter of the upper part of the valvular structure could be the same size as the balloon, so that there would be no distension of the valvular part of the valve at the time of implantation, and therefore no risk of deterioration of the valvular structure by the inflated balloon.

The foldable part of the valve could be reinforced by strengthening struts to prevent an eversion of the valve towards the left ventricle during diastole.

Another shape of the valvular structure, as illustrated in FIGS. **11***a* and **11***b* comprise four portions, alternatively a main portion **23** and a more narrow portion **24**. The main and the narrow portions are facing each other. Each portion has an isosceles trapezoidal shape. The main portions **23** are flexible but with some slight rigidity and the more narrow portions **24** are compliant, more supple and foldable. In this type of design, the two slightly rigid main portions **23** maintain the valvular structure closed during diastole by firmly applying on each other in their upper extremities, thus forming a slot-like closure **25**. This particular embodiment needs less foldable tissue than in the previous embodiments and the closure of the valvular structure at the time of early diastole does not have any tendency to collapse towards the aortic annulus.

Another design for the valvular structure is a combination of a cylindrical shape followed by a truncated shape.

This type of valvular structure is longer that the hyperboloidal type, for instance, 25 or 30 mm long, therefore exceeding out of the upper part of the metallic frame, by 10 to 20 mm. The cylindrical part corresponds to the I0 metallic frame and remains inside it. The truncated conic shape is the upper part of the valvular structure, totally exceeding out of the upper extremity of the metallic frame. An advantage of such a design is that the balloon can be inflated only in the cylindrical part of the valvular structure, therefore without risk of stretching the truncated conical part of the upper diameter which is smaller than that of the inflated balloon.

When the upper extremity of the cylindrical part has the same size as the lower extremity, there is no difference during balloon inflation in the degree of force exerted by the balloon on the lower and on the upper extremity of the valvular structure. Preferably, rectilinear reinforcing struts are used in this embodiment, to strengthen the valve structure and aid in its shutting without collapsing and inverting inside the left ventricle through the aortic annulus under the force of the diastolic pressure.

Two different processes for implanting a valve according to the present invention are shown respectively in FIGS. **13***a* to **13***l* with a unique balloon catheter, as illustrated in FIGS. **12***a* and **12***b* and in FIGS. **15***a* to **15***f*, with a two-balloon catheter, as illustrated in FIG. **14**.

The IV positioning in the aortic orifice and its expansion can be performed with the help of a unique substantially cylindrical balloon catheter **26** in the so-called unique-balloon catheterization technique.

Preparing for its introduction by transcutaneous route in the femoral artery, the IV **13** is, as illustrated in the perspective view of FIG. **10***a* in a compressed form crimpled on the balloon catheter **26**. A central sectional view of the mounted IV **13** on the complete balloon catheter **26** is shown in FIG. **12***b*.

The shaft **27***f* of the balloon dilatation catheter **26** is as small as possible, i.e., a 7 F (2.2 mm) or a 6 F (1.9 mm) size. The balloon **26** is mounted on the shaft **27** between two rings R. Moreover, the shaft **27** comprises a lumen **28** (FIG. **12***b*) as large as possible for inflation of the balloon **26** with diluted contrast to allow simple and fast inflation and deflation. It has also another lumen **29** able to accept a stiff guide wire **30**, for example 0.036 to 0.038 inches (0.97 mm), to help position the implantable valve with precision.

The balloon **26** has, for example, a 3 to 4 cm length in its cylindrical part and the smallest possible size when completely deflated so that it will be able to be placed inside the folded valve having an outside diameter which ranges between about 4 and 5 mm. Therefore, the folded balloon preferably has at the most a section diameter of about 2.5 to 3 mm.

The balloon is therefore made of a very thin plastic material. It is inflated with saline containing a small amount of contrast dye in such a way to remain very fluid and visible when using X-ray.

However, the balloon **26** has to be sufficiently strong to resist the high pressure that it has to withstand to be capable of expanding the folded valvular structure **14** and the compressed frame in the stenosed aortic orifice considering that, although pre-dilated, the aortic orifice still exerts a quite strong resistance to expansion because of the recoil phenomenon.

This procedure is shown in FIGS. **13***a* to **13***e*.

In contrast to the technique used when performing the usual aortic dilatation (without valve implantation), i.e., inflating the balloon maximally markedly above the nominal pressure, if possible, up to the bursting point (which occurs always with a longitudinal tear, without deleterious consequence, and with the advantage of both exerting a maximal dilating force and restoring blood ejection instantaneously), the balloon inflated for expansion of an implantable valve should not burst in any case. Indeed, bursting of the balloon would involve a risk of incomplete valve expansion and wrong positioning. Therefore, the balloon should be very resistant to a very high pressure inflation. Furthermore, the balloon is inflated only up to the nominal pressure indicated by the maker and the pressure is controlled during inflation by using a manometer. Such relatively low pressure should be sufficient since prior to positioning the IV, an efficacious dilatation of the stenosed aortic valve according to the usual technique with a maximally inflated balloon for example 20 mm or 25 mm in size in such a way to soften the distorted valvular tissue and facilitate the enlargement of the opening of the valve at time of IV implantation is performed.

The implantation of the aortic valve **20** can be made in two steps, as described as follows.

The first step, as shown in FIGS. **13***a* to **13***f*, consists in introducing the shaft **27** and balloon catheter **26** along the guide wire previously positioned in the ventricle **4** (FIGS. **13***a*-**13***b*). The dilatation of the stenosed aortic valve **1'**, **2'** using a regular balloon catheter, according to the commonly performed procedure, i.e., with the guide wire **30** introduced in the ventricle **4** (FIG. **13***a*) and with maximal inflation of the balloon **26** (FIGS. **13***c* to **13***d*) up to the bursting point. Dilatation is performed at least with a balloon having about 20 mm diameter, but it can be performed with a balloon having about 23 mm diameter so as to increase maximally the aortic orifice opening before implantation of the valve although the implantable valve is about 20 mm in diameter. This preliminary dilatation of the aortic orifice helps in limiting the force required to inflate the balloon used to expand the implantable valve and position it in the aortic orifice, and also in limiting the recoil of the aortic valve that occurs immediately after balloon deflation. The balloon is deflated (FIG. **13***a*) and pulled back on the wire guide **30** left inside the ventricle.

Owing to the marked recoil of the stenosed valve and also of the strong aortic annulus, the 20 mm diameter valve is forcefully maintained against the valvular remains at the level of the aortic annulus. Preliminary dilatation has another advantage in that it permits an easier expansion of the IV, having a lower pressure balloon inflation which helps prevent damage of the valvular structure of the IV. This also facilitates the accurate positioning of the prosthetic valve.

The second step corresponds to the implantation of the valve **13** is shown in FIGS. **13***g* to **13***l*. The positioning of the IV needs to be precise at a near 2 or 3 mm, since the coronary ostia **6** has to remain absolutely free of any obstruction by the valve **13** (FIGS. **13***k* and **13***l*). As mentioned above, this is, for example, performed with the help of the image of the subvalvular angiogram in the same projection fixed on an adjacent TV screen. The expansion and the positioning of the valve prosthesis **13** is performed within a few seconds (15 to 20 among at most) since during the maximal balloon inflation (which has to be maintained only a very few seconds, 3, 4) the aortic orifice is obstructed by the inflated balloon **31** and the cardiac output is zero (FIG. **13***h*). As for the pre-dilatation act itself, the balloon **26** is immediately deflated within less than 5 or 6 seconds (FIG. **13***j*) and, as soon as the deflation has clearly begun, the closing and opening states of the IV are active whereas the balloon is pulled back briskly in the aorta (FIGS. **13***j* to **13***l*). In case the IV is not maximally expanded by the first inflation, it is possible to replace the balloon inside the IV and to reinflate it so as to reinforce the expansion of the IV.

The IV **13** can also be used in aortic regurgitation. This concerns more often younger patients rather than those with aortic stenosis. The contraindication to surgical valve replacement is often not due to the old age of the patients, but stems mainly from particular cases where the general status of the patient is too weak to allow surgery, or because of associated pathological conditions. Apart from the fact that there is no need for a preliminary dilatation, the procedure of the valve implantation remains approximately the same. The balloon inflation inside the IV is chosen accordingly, taking also into account the fact that it is necessary to overdilate the aortic annulus to obtain a recoil phenomenon of the annulus after balloon deflation to help maintain the IV in position without any risk of displacement.

However, the size of the expanded implantable valve is around 25 to 30 mm in diameter, or even bigger, because the aortic annulus is usually enlarged. A preliminary measurement of the annulus will have to be performed on the subvalvular angiography and by echocardiography to determine the optimal size to choose.

The IV can be used in the mitral position, mainly in case of mitral regurgitation, but also in case of mitral stenosis. Here again, the IV **20** is only described when used only in cases of contraindication to surgical valve repair or replacement. The procedure is based on the same general principles though the route for the valve positioning is different, using the transseptal route, like the commonly performed mitral dilatation procedure in mitral stenosis. The IV size is quite larger than for the aortic localization (about 30 to 35 mm in diameter when expanded or clearly above in case of a large mitral annulus, a frequent occurrence in mitral insufficiency), to be capable of occupying the mitral area. A preliminary measurement of the mitral annulus is performed to determine the optimal implantable valve size to choose. Since the introduction of the IV is performed through a venous route, almost always through the femoral vein which is quite large and distensable, the bigger the size of the IV in its compressed position is not a drawback even if the diameter size is about 6 or 7 mm. Moreover, the problem of protection of the coronary ostia as encountered in the aortic position does not exist here which therefore makes the procedure easier to be performed.

Finally, the IV can be used to replace the tricuspid valve in patients with a tricuspid insufficiency. This procedure is simple to perform since the positioning of the IV is made by the venous route, using the shortest way to place in the right position at the level of the tricuspid orifice practically without any danger from clot migration during the procedure. A large implantable valve is used, with a diameter of about 40 mm or even larger because the tricuspid annulus is often markedly dilated in tricuspid insufficiency. Here also, as in the mitral position, the compressed IV and the catheter used can be without inconvenience, quite larger than that for the aortic position because of the venous route used.

Furthermore, it has to be noted that the IV can be used also as a first step in the treatment of patients who have contrain-

dication to surgery, when they are examined for the first time, but who could improve later on after correction of the initial hemodynamic failure. The IV procedure can be used as a bridge towards surgery for patients in a weak general condition which are expected to improve within the following weeks or months after the IV procedure in such a way that they can be treated by open heart surgery later on. In the same vein, the IV procedure can be used as a bridge towards surgical valve replacement or repair in patients with a profoundly altered cardiac function that can improve secondarily owing to the hemodynamic improvement resulting from the correction of the initial valvular disease by the IV implantation.

Another technique for implantation of an aortic valve by transcutaneous catheterization uses a two-balloon catheter.

An example of this technique using the two parts IV with a two-balloon catheter **40** is shown in FIG. **14**.

Two-balloons **26** and **26'** are fixed on a unique catheter shaft **27**, said balloons being separated by a few millimeters. The two balloons are preferably short, i.e., about 2 to 2.5 cm long in their cylindrical part. The first balloon **26** to be used, carries a first frame **10** aimed at scaffolding the stenosed aortic orifice after initial dilatation. This first balloon **26** is positioned on the aorta side, above the second balloon **26'** which is positioned on the left ventricle side. The second balloon **26'** carries the expandable valve **13** which is of the type described above made of a second frame **10'** and a valvular structure **14** attached to said frame **10'**. The difference is that the second frame does not need to be as strong as the first frame and is easier to expand with low balloon pressure inflation which does not risk damaging the valvular structure **14**.

This enlarges the choice for making a valvular structure without having to face two contradictory conditions:

having a soft and mobile valvular structure **14** capable of opening and closing freely in the blood stream without risk of being damaged by a balloon inflation; and

needing a reinforced frame strong enough to be capable of resisting without any damage, a strong pressure inflation of the expanding balloon.

The shaft **27** of this successive two-balloon catheter **40** comprises two lumens for successive and separate inflation of each balloon. Indeed, an additional lumen capable of allowing a fast inflation occupies space in the shaft and therefore an enlargement of the shaft is necessary. However, this enlargement of the shaft stops at the level of the first balloon **26** since, further to said first balloon, only one lumen is necessary to inflate the second balloon 2C, at the level of the IV which is the biggest part of the device.

Another advantage of this two part IV with a two-balloon catheter is that each set of implantable valve and balloon has a smaller external diameter since each element to be expanded, considered separately, is smaller than in combination. This allows obtaining more easily a final device with an external diameter 14 F.

The first balloon is sufficiently strong to avoid bursting even at a very high pressure inflation. This first balloon is mounted in the frame in its deflated position, prior to its introduction by the strong frame which is aimed to scaffold the dilated stenosed aortic valve. The size and shape of said frame is comparable to what has been described previously but said frame is calculated (in particular the material, the number and diameter of its bars are chosen by the person skilled in the art) to make sure that it will resist the recoil of the dilated valve and that it will be securely embedded in the remains of the native aortic valve.

The second balloon does not need to be as strong as the first one and, therefore, can be thinner, occupying less space and being easier to expand with a lower pressure for balloon inflation. This second balloon **26'** is mounted in the valve itself which, as in the preceding description, comprises a frame to support the valvular structure and said valvular structure.

Also, the second frame **10'** does not need to be as strong as the first one. This frame can be slightly shorter, 10 mm instead of 12 mm, and its bars can be thinner. This frame can have an external surface which is a bit rough to allow better fixation on the first frame when expanded. The bars may also have some hooks to fasten to the first frame.

The valvular structure is attached on said second frame and expanded by relatively low pressure in the second balloon called hereafter the IV balloon. It does not need to be as strong as in the preceding case (IV in one part and unique balloon catheter technique) and, therefore, it occupies less space and has less risk to be damaged at the time of expansion.

This technique is shown in FIGS. **15***a* to **15***f*.

One of the problems relevant to the IV implantation procedure as described above, with the IV in one part, is the expansion at the same time by the same balloon inflation of both the frame and the valvular structure. Indeed, the frame is a solid element and the valvular structure is a relative weak one that could be damaged when squeezed by the inflated balloon.

Therefore, the valve implantation can be performed in two immediately successive steps. The first step (FIGS. **15***a*-**15***b*) corresponds to the expansion and the positioning of the first frame with the first balloon **26** wherein inflation is performed at a high pressure. The second step (FIGS. **15***d*-**15***e*) corresponds to the expansion and the positioning of the valvular structure **14** inside the frame **10'** using the second balloon **2C**. This second step follows the first one within a few seconds because, in the time interval between the two steps, there is a total aortic regurgitation towards the left ventricle which is an hemodynamic condition that cannot be maintained for more than a few heart beats, i.e., a few seconds, without inducing a massive pulmonary edema and a drop to zero of the cardiac output.

In another embodiment, the first frame to be introduced comprises the valvular structure and the second frame being stronger than the first one to scaffold the previously deleted stenosed aortic valve.

The advantage of this two step procedure would be to allow expansion and positioning of the frame part **10'** of the R **13** using strong pressure inflation of the balloon **26'** without the risk of damaging the valvular structure **14** which, for its own expansion, would need only light pressure inflation.

The method is schematically detailed in FIGS. **15***a* to **15***f*. A previous dilatation of the stenosed aortic valve is performed as an initial step of the procedure to prepare the distorted valve to facilitate the following steps:

1/ positioning the double balloon catheter **40** with the first balloon **26** with the frame at the level of the aortic annulus **2***a*, the second IV balloon **26'** being inside the left ventricle beyond the aortic annulus **2***a* (FIG. **15***a*);

2/ compression of the stenosed aortic valve **1'**, **2'** with the first balloon **26** having a 20 mm, preferably with a 23 mm diameter, the balloon being inflated maximally up to

the bursting point, to prepare the IV insertion (FIG. **15***b*). Inflation lasts a few seconds (preferably 10 seconds at most) with powerful pressure being used to expand the frame and forcefully embed said frame in the remains of the dilated valve;

3/ an immediate speedy deflation of said first balloon **26** follows (FIG. **15***c*); as soon as the balloon **26** is beginning to clearly deflate, the first frame **10** remaining attached to the stenosed valve **1'**, **2'**, the catheter is withdrawn to position the IV balloon **26'** inside the previously expanded frame **26** (FIG. **15***c* in which the frame **10'** is partially drawn for clarity purpose); and

4/ immediately after being well positioned, the IV balloon **26'** is promptly inflated, to expand the IV **13** (FIG. **15***c*); and/when the IV **13** is blocked inside the first frame **10**, the IV balloon **26'** is deflated (FIG. **18***f*).

Finally, the whole device has to be withdrawn to allow homeostasis of the femoral artery puncture hole.

The total duration of the successive steps, particularly the time during which the balloons are inflated, and the time during which the frame is expanded whereas the valve has not yet been positioned and expanded, is about 20 to 30 seconds. This is feasible if the balloons are inflated and deflated within very a few seconds, 6 to 8, for instance. This is permitted if the lumen of the shaft can be sufficiently large, taking into account the inescapable small diameter size of the shaft. This can also be facilitated by a device producing instantaneously a strong inflation or deflation pressure.

What is claimed is:

**1**. A prosthetic valve for implantation in a stenosed aortic valve, comprising:

a metallic frame having intersecting bars, the frame being compressible to a compressed external diameter capable of being introduced through an 18 French arterial introducer and into a patient's vasculature using a catheterization technique, the frame being expandable for implantation in the stenosed aortic valve, the intersecting bars of the frame having a diameter in the range of 0.1 to 0.6 mm for providing the frame with sufficient radial strength to resist the recoil force exerted by the stenosed aortic valve, the frame having an upper extremity formed with a zig-zag shape and a lower extremity formed with a zig-zag shape;

a flexible valvular structure made with pericardial tissue, the valvular structure sewn to the frame with stitches made directly around the bars of the frame, the valvular structure positioned entirely between the upper and lower extremities of the frame when in a closed position; and

an internal cover made with pericardial tissue and sewn to the frame, the internal cover fastened on an internal surface of the frame for preventing a passage of blood through spaces between the bars of the frame, the internal cover having an inlet end sewn to the lower extremity of the frame along a zig-zag line, the internal cover having an outlet end sewn to the valvular structure;

wherein the internal cover extends between the lower extremity of the frame and the valvular structure and wherein blood is permitted to pass through spaces in the frame between the valvular structure and the upper extremity of the frame.

**2**. The prosthetic valve of claim **1**, wherein the internal cover strengthens the fastening of the valvular structure to the frame.

**3**. The prosthetic valve of claim **1**, wherein the frame comprises a concave shape profile.

**4**. The prosthetic valve of claim **1**, wherein the valvular structure forms a continuous surface and is provided with guiding means.

**5**. The prosthetic valve of claim **4**, wherein the guiding means create stiffened zones which induce the valvular structure to follow a patterned movement when moving from the closed position to the open position.

**6**. The prosthetic valve of claim **5**, wherein the guiding means are further configured to prevent eversion of the valvular structure.

**7**. The prosthetic valve of claim **1**, wherein the frame is configured to be expanded by a balloon.

**8**. The prosthetic valve of claim **1**, wherein the frame is further compressible to a compressed external diameter capable of being introduced through a 16 French arterial introducer.

**9**. The prosthetic valve of claim **1**, wherein the frame is further compressible to a compressed external diameter capable of being introduced through a 14 French arterial introducer.

**10**. The prosthetic valve of claim **1**, wherein a substance with anti-thrombotic properties is incorporated into the valvular structure.

**11**. The prosthetic valve of claim **1**, wherein the frame constitutes a grate type structure.

**12**. The prosthetic valve of claim **1**, wherein the upper and lower extremities of the frame are rounded and smooth.

**13**. The prosthetic valve of claim 1, wherein the frame comprises an expanded external diameter of about 20 to 25 millimeters for contacting the stenosed aortic valve after the prosthetic valve is implanted.

**14**. A prosthetic valve for implantation in a stenosed aortic valve by a catheterization technique, comprising:

a compressible and expandable frame made with intersecting metallic bars, the frame having a compressed external diameter capable of being introduced into a patient's vasculature through an 18 French arterial introducer using a catheterization technique, the intersecting metallic bars of the frame having a diameter in the range of 0.1 to 0.6 mm for providing the frame with sufficient radial strength to resist the recoil force exerted by the stenosed aortic valve, the frame being expandable to a shape comprising a concave profile and having an upper extremity formed with a zig-zag shape and a lower extremity formed with a zig-zag shape;

a flexible valvular structure having open and closed states, the valvular structure sewn directly to the frame between the upper and lower extremities of the frame, the valvular structure made with pericardial tissue and positioned entirely between the upper and lower extremities of the frame when in the closed position; and

an internal cover made with pericardial tissue and sewn to the frame, the internal cover fastened on an internal surface of the frame for preventing a passage of blood through spaces between the bars of the frame, the internal cover having an inlet end sewn to the lower extremity of the frame along a zig-zag line, the internal cover having an outlet end sewn to the valvular structure;

wherein the internal cover extends only between the lower extremity of the frame and the valvular structure.

**15**. The prosthetic valve of claim **14**, wherein the frame is further compressible to a compressed external diameter capable of being introduced through a 16 French arterial introducer.

**16**. The prosthetic valve of claim **14**, wherein the upper and lower extremities of the frame are rounded and smooth.

**17**. The prosthetic valve of claim **14**, wherein the internal cover strengthens the fastening of the valvular structure to the frame.

**18**. The prosthetic valve of claim **14**, wherein the frame is configured to be expanded by a balloon.

**19**. The prosthetic valve of claim **14**, wherein a substance with anti-thrombotic properties is incorporated into the valvular structure.

**20**. The prosthetic valve of claim **14**, wherein the frame constitutes a grate type structure.

* * * * *

# EXHIBIT 2

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Appl. No.: 11/942,690 Confirmation No.: 2062

Applicant: Letac et al.

Filed: November 19, 2007

TC/A.U.: 3738

Examiner: Brian E. Pellegrino

Docket No.: PVI-5791CON5

Customer No.: 30452

## AMENDMENT

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Responsive to the Office Action dated April 28, 2010, please amend the above-identified application as follows:

**Listing of the Claims** begins on page 2 of this paper.

**Remarks** begin on page 9 of this paper.

structure having open and closed positions, the flexible valvular structure located entirely between the inlet and outlet ends of the stent when in the closed position; and

an internal cover formed of pericardial tissue, the internal cover sewn to the stent along the internal surface and contacting the internal surface, the internal cover extending only along the internal surface and only between the valvular structure and the inlet end of the stent, the internal cover forming a sleeve for preventing blood from flowing through gaps in a wall of the stent between the valvular structure and the inlet end of the stent;

wherein the internal cover is sewn directly to the valvular structure such that the internal cover is securely coupled to the valvular structure and wherein blood is permitted to flow through gaps in the wall of the stent downstream of the valvular structure for providing blood to the coronary arteries.

Claim 20 (**Currently Amended**): The prosthetic valve assembly of claim 19, wherein an inlet end of the internal cover has a zig-zag shape and the inlet end of the ~~frame~~ stent has a zig-zag shape and wherein the inlet end of the internal cover is sewn to the inlet end of the stent along a zig-zag line.

Claim 21 (**Currently Amended**): A prosthetic valve assembly for replacing a stenotic aortic valve using a catheterization technique, comprising:

a collapsible and expandable metallic stent having an inlet end, an outlet end and an internal surface, the stent ~~configured~~ being collapsible to a collapsed diameter of 5.7 millimeters or less for advancement through an introducer and into a patient's vasculature via a catheterization technique ~~when in a collapsed state~~, the stent formed with ~~intercrossing bars~~ a plurality of intersecting bars with spaces therebetween, ~~and~~ the stent having sufficient radial strength for holding open the stenotic aortic valve when in an expanded state;

a flexible valvular structure made with pericardial tissue and fastened to a middle portion of the stent between the inlet and outlet ends; and

an internal cover extending only along the internal surface of the stent, the internal cover comprising pericardial tissue and ~~positioned between the inlet and outlet ends of the stent, the~~

~~internal cover~~ sewn to the stent along ~~at least a portion of~~ the internal surface ~~and~~ by suture lines extending around the intersecting bars of the stent, the internal cover forming a sleeve that ~~contacts the internal surface at least~~ extends between the valvular structure and the inlet end of the stent for preventing passage of blood through ~~gaps in~~ the spaces between the bars of the stent~~;wherein the internal cover has an internal cover length extending from an inlet edge to an outlet edge of the internal cover, the internal cover length being less than a stent length extending from the inlet end of the stent to the outlet end of the stent,~~ and wherein, when the valve assembly is implanted in a patient, blood is permitted to flow through the spaces between the ~~intercrossing~~ bars of the stent ~~between the outlet edge of the internal cover and the outlet end of the stent~~ downstream of the valvular structure for providing blood to the coronary arteries.

Claim 22 (**Canceled**)

Claim 23 (Previously Presented): The prosthetic valve assembly of claim 21, wherein the stent has a first diameter at the inlet end, a second diameter at the outlet end and a third diameter along the middle portion and wherein the first and second diameters are both greater than the third diameter.

Claims 24-28 (**Canceled**)

Claim 29 (**New**): A prosthetic heart valve for implantation using a catheterization technique, comprising:

a collapsible and expandable metallic stent having an inlet end and an outlet end and formed with a plurality of intersecting bars with open spaces between the bars when in an expanded state, the stent being collapsible for advancement through a patient's vasculature;

a flexible valvular structure made with pericardial tissue and having open and closed positions, the flexible valvular structure located entirely between the inlet and outlet ends of the stent when in the closed position; and

cover is positioned along the internal surface and contacts only the internal surface. There is no teaching or suggestion in the cited references regarding an internal cover that extends only between an inlet end of the stent and a valvular structure and wherein blood is permitted to flow through gaps between intersecting bars of the stent downstream of the valvular structure. Applicants further note that there is no teaching in the cited references regarding a prosthetic valve assembly comprising a stent which contains a valvular structure and an internal cover, wherein the entire structure is radially collapsible to a diameter of about 5 millimeters for advancing the prosthetic valve assembly through a patient's vasculature via a catheterization technique.

In summary, there is no teaching or suggestion in the cited references regarding the combination of limitations recited in amended claim 7. For at least the above reasons, Applicants respectfully submit that claim 7 is now in condition for allowance. Dependent claims 8-10 and 12-17 recite additional limitations which further distinguish over the cited references.

**Independent Claim 21**

Claim 21 was rejected under 35 USC §103(a) as being unpatentable over Andersen et al. (USP 5411552) in view of Fogarty et al. (USP 5824037) and Ionescu et al. (USP 4629459) and Fisher et al. (USP 4687483).

Applicants have amended claim 21 to recite "a collapsible and expandable metallic stent having an inlet end, an outlet end and an internal surface, *the stent being collapsible to a collapsed diameter of 5.7 millimeters or less for advancement through an introducer and into a patient's vasculature via a catheterization technique, the stent formed with a plurality of intersecting bars with spaces therebetween*, the stent having sufficient radial strength for holding open the stenotic aortic valve when in an expanded state." Claim 21 further recites "an internal cover *extending only along the internal surface of the stent*, the internal cover comprising pericardial tissue and sewn to the stent along the internal surface by *suture lines extending around the intersecting bars of the stent*, the internal cover forming a sleeve that *extends between*

*the valvular structure and the inlet end of the stent for preventing passage of blood through the spaces between the bars of the stent* and wherein, when the valve assembly is implanted in a patient, blood is permitted to flow through the spaces between the bars of the stent downstream of the valvular structure for providing blood to the coronary arteries."

There is no teaching or suggestion in the cited references regarding a prosthetic valve assembly comprising a stent, a valvular structure and an internal cover, wherein the entire prosthetic valve assembly is collapsible to a diameter of 5.7 mm or less for advancement through an introducer and into a patient's vasculature via a catheterization technique. There is no teaching or suggestion in the cited references regarding an internal cover which extends only along the internal surface of a stent and wherein the internal cover comprises pericardial tissue sewn to the stent along the internal surface by suture lines extending around the intersecting bars of the stent. There is no teaching or suggestion in the cited references regarding an internal cover which forms a sleeve that extends between the valvular structure and the inlet end of the stent.

Ionescu et al. (4629459) was cited with respect to the internal cover. Ionescu et al. disclose a prosthetic heart valve which is directly implanted during an open-heart surgical procedure. Ionescu et al. teach that a smooth layer of material (e.g., pericardial tissue) covers a non-collapsible stent for protecting the leaflets during normal function of the valve. For example, Figure 7 of Ionescu et al. illustrate the padded, covered stent in isolation. Applicants' internal cover has a different structure and purpose and therefore it would not have been obvious to combine the padding of Ionescu et al. with the other cited references to provide Applicants' claimed invention. Furthermore, there is no teaching or suggestion in Ionescu et al. regarding an internal cover that contacts only an internal surface of a stent and is sewn to the stent along the internal surface by suture lines extending around intersecting bars of the stent. There is no teaching or suggestion in Ionescu et al. regarding an internal cover that forms a sleeve which extends between the inlet end of the stent and the valvular structure for preventing passage of blood through the spaces below the valvular structure. As noted above, the purpose of the pericardial tissue of Ionescu et al. is to provide padding for protecting the leaflets of the valve. As such, Ionescu et al. provide no suggestion or motivation to attach a sleeve to a stent wherein

the sleeve extends away from the valve (i.e., from the valvular structure toward the inlet end of the stent). Finally, there is no teaching or suggestion in Ionescu et al. regarding an internal cover which extends only along an inlet portion of the stent such that blood is permitted to flow through the spaces between the bars of the stent downstream of the internal cover.

In summary, there is no teaching or suggestion in the cited references regarding the combination of limitations recited in amended claim 21. For at least the above reasons, Applicants respectfully submit that claim 21 is now in condition for allowance. Dependent claim 23 further distinguishes over the cited references by reciting that "the stent has a first diameter at the inlet end, a second diameter at the outlet end and a third diameter along the middle portion and wherein the first and second diameters are both greater than the third diameter."

**Allowance of Claims 19 and 20**

Applicants appreciate the allowance of claims 19 and 20. Applicants note that claim 20 has been amended to change "frame" to "stent" to provide a correct antecedent basis.

**New Claims 29-33**

New claim 29 recites a prosthetic heart valve comprising "a collapsible and expandable metallic stent having an inlet end and an outlet end and formed with a plurality of intersecting bars with open spaces between the bars when in an expanded state, the stent being collapsible for advancement through a patient's vasculature." Claim 29 further recites "a flexible valvular structure made with pericardial tissue and having open and closed positions, the flexible valvular structure located entirely between the inlet and outlet ends of the stent when in the closed position." Claim 29 further recites "an internal cover contacting only an internal surface of the stent, the internal cover sewn to the bars of the stent and to the valvular structure, the internal cover extending between the inlet end of the stent and the valvular structure." Finally, claim 29 recites that "the internal cover providing a sleeve for preventing regurgitation of blood through the open spaces of the stent between the inlet end of the stent and the valvular structure and

Serial No.: 11/942,690
Docket No.: PVI-5791CON5
Reply to Office Action dated April 28, 2010

**Conclusion**

Should the Examiner have any remaining questions, the Examiner is encouraged to contact the attorney of record at the telephone number shown below.

**Fees Due to File This Amendment**

Prior to the pending Office Action, a fee was paid for 27 claims, with 5 of them being independent claims. The aforementioned amendments have not resulted in any excess claims.

Respectfully submitted,

Date: May 26, 2010

/David L. Hauser/
David L. Hauser, Reg. No. 42,643
Edwards Lifesciences LLC
Law Department
One Edwards Way
Irvine, California 92614
Telephone: (949) 250-6878
Facsimile: (949) 250-6850
**Customer Number: 30452**

#14735v1<IP>

16

# EXHIBIT 3

# REDACTED
# IN ITS ENTIRETY

**CERTIFICATE OF SERVICE**

I, David M. Fry, hereby certify that on December 12, 2013, this document was served on the persons listed below in the manner indicated:

**BY E-MAIL**
Jack B. Blumenfeld
Regina S.E. Murphy
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rmurphy@mnat.com

Catherine Nyarady
Brian P. Egan
Christopher Terranova
Jenny C. Wu
Kripa Raman
Alexis R. Cohen
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
cnyarady@paulweiss.com
began@paulweiss.com
cterranova@paulweiss.com
jcwu@paulweiss.com
kraman@paulweiss.com
acohen@paulweiss.com

*/s/ David M. Fry*
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
dfry@shawkeller.com
*Attorney for Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc., and Medtronic Vascular, Inc.*