IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDWARDS LIFESCIENCES LLC and    )
EDWARDS LIFESCIENCES PVT, Inc.,    )
   )
         Plaintiffs,    )
   )
   )
       v.    )   C.A. No. 12-23 (GMS)
   )
MEDTRONIC COREVALVE LLC,    )   REDACTED - PUBLIC VERSION
MEDTRONIC CV LUXEMBOURG    )
S.A.R.L., MEDTRONIC VASCULAR    )
GALWAY LTD., MEDTRONIC, INC., and    )
MEDTRONIC VASCULAR, INC.,    )
   )
         Defendants.    )

**EDWARDS' LETTER TO THE HONORABLE CHIEF JUDGE GREGORY M. SLEET
FROM JACK B. BLUMENFELD IN OPPOSITION TO
MEDTRONIC'S MOTION *IN LIMINE* CONCERNING ITS
EVIDENTIARY ISSUE NO. 5 AND IN SUPPORT OF EDWARDS'
MOTIONS *IN LIMINE* CONCERNING ITS EVIDENTIARY ISSUES NOS. 4 AND 5**

                                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                   Jack B. Blumenfeld (#1014)
                                   Maryellen Noreika (#3208)
                                   Regina S. E. Murphy (#5648)
                                   1201 N. Market Street
                                   P.O. Box 1347
OF COUNSEL:                      Wilmington, DE 19899-1347
                                   (302) 658-9200
Nicholas Groombridge               jblumenfeld@mnat.com
Catherine Nyarady                  mnoreika@mnat.com
Kripa Raman                         rmurphy@mnat.com
Brian P. Egan                       *Attorneys for Plaintiffs Edwards Lifesciences*
Christopher Terranova             *LLC and Edwards Lifesciences PVT, Inc.*
Alexis R. Cohen
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

December 19, 2013 - Original Filing Date
December 19, 2013 - Redacted Filing Date

# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

302 658 9200
302 658 3989 Fax

Jack B. Blumenfeld
302 351 9291
302 425 3012 Fax
jblumenfeld@mnat.com

December 19, 2013 - Original Filing Date
December 19, 2013 - Redacted Filing Date
REDACTED - PUBLIC VERSION

The Honorable Gregory M. Sleet                                   *VIA ELECTRONIC FILING*
United States District Court
 for the District of Delaware
844 North King Street
Wilmington, Delaware  19801

    Re:    *Edwards Lifesciences LLC, et al.* v. *Medtronic CoreValve LLC, et al.,*
           C. A. No. 12-023 (GMS)

Dear Chief Judge Sleet:

    Pursuant to the Court's December 5, 2013 Order (D.I. 130 at 5; D.I. 131 at 47), Edwards respectfully submits this letter brief in opposition to Medtronic's Evidentiary Issue No. 5 (MDT Ltr. Br., D.I. 134; D.I. 126-1, Ex. W, at 2) and in support of Edwards' Evidentiary Issue Nos. 4 and 5, all of which relate to Edwards' infringement claims under 35 U.S.C. § 271(f). Medtronic seeks to preclude Edwards from presenting evidence that ███████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ *(See* D.I. 126-1, Ex.
V, at 2).[1]

**I.**    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1]  Relevant here are the meaning of "supplies or causes to be supplied in or from the United
States all or a substantial portion of the <u>components</u> of a patented invention" as set forth in §
271(f)(1), and the meaning of "supplies or causes to be supplied in or from the United States
any <u>component</u> of a patented invention that is especially made or especially adapted for use
in the invention and <u>not a staple article or commodity of commerce suitable for substantial
noninfringing use</u>" as set forth in § 271(f)(2).

The Honorable Gregory M. Sleet
December 19, 2013
Page 2

[REDACTED]

[REDACTED]

[REDACTED] Medtronic's entire argument is based on a flawed interpretation of *Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437 (2007).  Tellingly, Medtronic ignores the only salient point from *Microsoft* relevant to its evidentiary issue here: the definition of "component" under § 271(f) as "a constituent part," "element," or "ingredient."[2]  *Id.* at 449 n.11.

[REDACTED]

*Microsoft* hinges on two inquiries unrelated to the instant matter: (i) "when, or in what form, does software qualify as a 'component' under § 271(f)"; and (ii) were "components" of the foreign-made computers "supplied" by Microsoft "from the United States."  *Microsoft*, 550 U.S. at 447.  Microsoft stipulated to infringement when Windows software is loaded onto a computer in the United States.  *Id.* at 446.  At issue was Microsoft's supply from the United States to foreign manufacturers of master disks with Windows software.  *Id.* at 445-46.  The foreign

---

[2]   The Federal Circuit later adopted this same meaning of "component" in *Cardiac Pacemakers, Inc.* v. *St. Jude Medical, Inc.*, 576 F.3d 1348, 1363 (Fed. Cir. 2009).

[3]   Claim 1 of the '825 Patent claims "a flexible valvular structure made with pericardial tissue" and "an internal cover made with pericardial tissue."  '825 Patent Claim 1, col. 21, ll. 49, 55) (emphasis supplied).

The Honorable Gregory M. Sleet
December 19, 2013
Page 3

manufacturer would use the master disk to generate copies, and it was those new copies made abroad, not the master disk supplied from the U.S., that were then installed on the foreign manufacturer's computers. *Id.*

To resolve the first inquiry, the *Microsoft* Court analogized software in the abstract to a blueprint and set forth that "[a] blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device." *Id.* at 450. Thus, only "a copy of Windows, not Windows in the abstract, qualifies as a 'component' under § 271(f)." *Id.* at 451-52. On the second inquiry, the Court held that "the very components supplied from the United States, and not copies thereof, trigger § 271(f) liability when combined abroad to form the patent invention at issue. . . . [T]he copies of Windows actually installed on the foreign computers were not themselves supplied from the United States. . . . Without stretching § 271(f) beyond the text Congress composed, a copy made entirely abroad does not fit the description 'supplie[d] . . . from the United States.'" *Id.* at 453-54.

The facts of *Microsoft* are inapposite. ██████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████ In *Lucent Technologies Inc.* v. *Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), the Federal Circuit, analyzing a contributory infringement claim under 35 U.S.C. § 271(c),[5] noted that an infringer "'should not be permitted to escape liability as a contributory infringer merely by embedding [the infringing apparatus] in a larger product with some additional, separable feature . . . .'" *Id.* at 1320 (quoting *Ricoh Co.* v. *Quanta Computer Inc.*, 550 F.3d 1325, 1337 (Fed. Cir. 2008), *cert. denied*, 577 U.S. 936 (2009)). ████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[4] Medtronic misreads *Microsoft's* reference to an "extra step" to mean that if an extra processing step is required abroad, it cannot be a "component" of the claimed invention. *Microsoft*, 550 U.S. at 451. The "extra step" in *Microsoft* was the "extra step" required to make "intangible, uncombinable information" (*i.e.*, a non-component) into a "usable, combinable part" (i.e., a component). ████████████████████████████

[5] 35 U.S.C. § 271(c) (contributory infringement) has identical language to 35 U.S.C. § 271(f)(2) concerning a "staple article" and "substantial non-infringing uses." Therefore, cases interpreting this language are applicable to both § 271(c) and § 271(f)(2). (*See* 5 Donald S. Chisum, CHISUM ON PATENTS § 17.03[1] (2012)).

The Honorable Gregory M. Sleet
December 19, 2013
Page 4

████████████████████████████████████████████████████████████

**II.** ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Each is improper.

The law is clear: noninfringing uses under § 271(f)(2) must be *actual* uses that employ treated pericardial tissue that is the same as the pericardial tissue *actually supplied* by Medtronic. *See, e.g.*, *Hodosh* v. *Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987) (holding that "the material *actually sold*" must be a "staple article") (emphasis added); *Golden Blount, Inc.* v. *Robert H. Peterson Co.*, 438 F.3d 1354, 1364 (Fed. Cir. 2006) (requiring "evidence that anyone *actually made or used* the assembly" in a non-infringing manner) (emphasis added); *Mentor H/S Inc.* v. *Medical Device Alliance, Inc.*, 244 F.3d 1365, 1372 (Fed. Cir. 2001) (lack of evidence of actual noninfringing use entitled jury to find contributory infringement); *see also Vita-Mix Corp.* v. *Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009) ("non-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental."). Thus, Medtronic's attempt to introduce evidence of (i) ████████████████████

████████████████████████████████████████████████████████████

**III.   Conclusion**

Edwards respectfully requests that the Court deny Medtronic's Evidentiary Motion No. 5 and grant Edwards' Evidentiary Motion Nos. 4 and 5.

The Honorable Gregory M. Sleet
December 19, 2013
Page 5

Respectfully,

Jack B. Blumenfeld (#1014)

JBB/dlw
Enclosures
cc:    Clerk of the Court (Via Hand Delivery; w/ encl.)
       All Counsel of Record (Via Electronic Filing; w/ encl.)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDWARDS LIFESCIENCES LLC AND )
EDWARDS LIFESCIENCES PVT, )
INC., )
          )
       Plaintiffs, )
          )
v. )C.A. No.: 12-23 (GMS)
          )
MEDTRONIC COREVALVE LLC, )
MEDTRONIC CV LUXEMBOURG )
S.A.R.L., MEDTRONIC VASCULAR )
GALWAY LTD., MEDTRONIC, INC., )
AND MEDTRONIC VASCULAR, INC., )
          )
       Defendants. )
_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF DAVID A. MONTECALVO

January 18, 2013


    The videotaped deposition of DAVID MONTECALVO, a

witness produced and sworn before me, Lisa A. Blanks,

RPR, CRR, was taken on behalf of the Plaintiffs at the

offices of Robins, Kaplan, Miller & Ciresi L.L.P., 800

LaSalle Avenue, 7th Floor, Minneapolis, MN, on the 18th

day of January, 2013, at 9:09 a.m.

1    Galway?

2        A.    For this particular option that was

3    considered, yes.

4        Q.    Okay.  When you look at the line that says,

5    "Santa Ana," it says, "Tissue processing 100 percent."

6              Do you see that?

7        A.    Yes.

8        Q.    What is tissue processing referring to?

9        A.    The incoming inspection of the tissue and then

10   the subsequent tissue fixation process.

11       Q.    Just to step back a moment.  When we're

12   referring to the Medtronic CoreValve product as

13   pictured, for example, in Exhibits 248 and 249, what

14   material components is the device made of?

15             MS. ROBERG-PEREZ:  Objection, form.

16             MR. EGAN:  You can answer.

17             THE WITNESS:  There are pericardial tissue

18   components.  There is a nitinol frame, and there is

19   suture material that's used in the manufacturing of the

20   device.

21       Q.    BY MR. EGAN:  So effectively, it's pericardial

22   tissue, a nitinol frame and sutures, is that correct?

23       A.    That's correct.

24       Q.    And so when we look at Exhibit 251 and it

25   talks about tissue processing in Santa Ana, that's

1      A.   Correct.

2      Q.   And I believe you testified earlier that the

3  valve material in the Melody valve is a bovine jugular

4  valve material, correct?

5      A.   Correct.

6      Q.   So other than the Medtronic CoreValve device

7  that's being assembled in the Tijuana facility, are

8  there any other devices in the Medtronic Tijuana

9  facility that used porcine pericardium?

10      A.   No.

11      Q.   So the Medtronic CoreValve device is the only

12  device in the Tijuana facility that uses porcine

13  pericardium?

14      A.   That is correct.

15      Q.   I'm next going to hand you what we're going to

16  mark as Exhibit 252.

17                  (Montecalvo Exhibit 252 was marked

18                  for identification.)

19      Q.   BY MR. EGAN:  For the record, Exhibit 252

20  bears Bates numbers Medcore 974827 to Medcore 974846.

21           Do you recognize this document,

22  Mr. Montecalvo?

23      A.   Yes.

24      Q.   And what is this document?

25      A.   This is a quarterly update relative to the

1        Q.    BY MR. EGAN:  Are you familiar with the AOA

2    process?

3        A.    Generally familiar, yes.

4        Q.    And what is the AOA process?

5        A.    It's a process we use to treat our tissue to

6    minimize or eliminate the amount of calcification that

7    occurs on the tissue.

8        Q.    Do you know at what step of the manufacturing

9    procedure the AOA treatment is applied?

10        A.    I do not know specifically.

11        Q.    Do you know if Medtronic is currently treating

12    Medtronic CoreValve devices with the AOA treatment in

13    both Medtronic Mexico and in Mexico Irvine?

14        A.    Yes, we are.

15        Q.    So both sites are using the AOA treatment

16    process?

17        A.    I believe so, yes.

18        Q.    Going back to Medtronic's exportations of

19    porcine pericardial material, does Medtronic export

20    porcine pericardial tissue from Irvine to Mexico

21    intending that it'll be combined to form the Medtronic

22    CoreValve product?

23        A.    Yes.

24        Q.    And that's true for each of porcine

25    pericardial -- excuse me, that's true for each of

1    porcine pericardium coupons, pericardial sacs and laser

2    cut leaflets and skirts?

3        A.    Yes.

4             MR. EGAN:   Thank you very much for your time.

5    I have no further questions.

6             Given that it's the final day of discovery, I

7    would like to leave open the issue with regards to the

8    Excel spreadsheet and also reserve Edwards' rights to

9    supplement any discovery responses citing to testimony

10   from today, should it be relevant.

11            MS. ROBERG-PEREZ:   Okay.

12            THE VIDEOGRAPHER:   We're off the record at

13   5:23 p.m.

14            (Concluded at approximately 5:23 p.m.)

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

CONFIDENTIAL
May not be reproduced without written permission from Medtronic CoreValve



BRP – Bioburden Reduction Process

**Figure 1: Percutaneous Aortic Valve Manufacturing Flowchart**

HIGHLY CONFIDENTIAL                                    MEDCORE0962772

# EXHIBIT C

|  **Medtronic** | Biological Test Plan for Low-Density Polyethylene (LDPE) Bags | 10014325DOC Rev. 1A |
|---|---|---|

# Biological Test Plan for Low-Density Polyethylene (LDPE) Bags

**1.0   PURPOSE**

To characterize and evaluate LDPE bags supplied by Uline® and McMaster-Carr® for biological safety and biocompatibility.

**2.0   SCOPE**

This test plan applies to Uline® 20" x 24" LDPE bags, supplier model # S-1454, and McMaster-Carr® 20" x 24" LDPE bags, supplier model # 1928T99.

**3.0   INTRODUCTION**

The CoreValve percutaneous aortic valve (PAV) is a three component device composed of: porcine pericardium, a Nitinol frame, and a polytetrafluoroethylene (PTFE) suture. Currently, porcine pericardium received at the design and manufacturing site in Irvine is packaged and shipped in glass jars (0100229) with a lid (1100337-063) and gasket (1100442-063) to the secondary manufacturing facility in Tijuana. Two brands of open-top bags composed of 100% LDPE film are being evaluated as transport vessels to replace the glass shipping jars. These tissues will be shipped in a 0.25% glutaraldehyde solution (030001) for a maximum of seven days over a temperature range of 0°- 40°C (32° - 104°F). The LDPE bag will serve as a conduit between steps in the manufacturing process; it is not represented in the final medical device and does not have any direct contact with the patient. However, since this vessel will transport components that are intended for long-term implantation, a biological evaluation will be performed to support patient safety.

**4.0   MATERIAL AND TISSUE CONTACT**

LDPE bags from both suppliers have similar properties. The rationale for using two suppliers is to ensure Medtronic business continuity in the event of a break in the supply chain from one of the two companies. A brief description of these devices follows:

**Table 4.1**

| Material | Component | Supplier model # | Characterization of Tissue Contact (ISO 10993-1) |
|---|---|---|---|
| 100% virgin LDPE film (Uline®) | Open-top Shipping bag | S – 1454 | NONE |
| 100% virgin LDPE film (McMaster-Carr®) | Open-top Shipping bag | 1928T99 | NONE |

4.1   The LDPE bag is not intended to have any patient tissue or blood contact. This classifies it as a non-tissue contacting component by the ISO 10993-1 definition. The bag will contain CoreValve porcine pericardium suspended in 0.25% glutaraldehyde solution during a shipping phase of the manufacturing process. The pericardium being

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------

EDWARDS LIFESCIENCES, LLC, and
EDWARDS LIFESCIENCES PVT, INC.,

      Plaintiffs,

                       Civil Action No.
-vs-                  12-23-GMS

MEDTRONIC COREVALVE, LLC,
MEDTRONIC CV LUXEMBOURG S.A.R.I,
MEDTRONIC VASCULAR GALWAY, LTD.,
MEDTRONIC, INC., and MEDTRONIC VASCULAR, INC.,

      Defendants.

-------------------------------------------------

VIDEOTAPED DEPOSITION

OF

GARY L. LOOMIS, Ph.D.

-------------------------------------------------

*** HIGHLY CONFIDENTIAL ***

ATTORNEYS' EYES ONLY

DATE TAKEN:  4/15/13      BY:  Amy L. Larson, RPR

1        that is used to make the CoreValve PAV?

2                MS. OBERTS:  Objection to form.

3                THE WITNESS:  No, I think I've

4        already answered it.  It's -- it's a --

5        ingredient is -- I'm not making a recipe

6        here.  It's -- it's a starting -- it's a

7        starting material.  It's one of the

8        materials -- no, it's one of the materials

9        used to -- to make it.  If they were going to

10       make it out of a -- out of a plastic

11       material, polyurethane, and somebody shipped

12       them sheets of polyurethane to cut the mold

13       of, it would be the same thing, they're just

14       shipping them the material.  But their sheets

15       of polyurethane have other uses and the

16       sheets of porcine pericardium have other

17       uses.

18  BY MR. EGAN:

19  Q.  In your opinion, correct?

20  A.  No, with my knowledge.  I know that Vascutek

21       used to make -- used to make vascular

22       patches, at least they did, maybe they still

23       do, out of -- out of porcine pericardium,

24       they used to get sheets of it.

25  Q.  Well, there's a dispute between you and

Page 220

1    Dr. Buller, is there not, as to whether or

2    not they're the same pericardial tissue due

3    to the amount of Glutaraldehyde that's used

4    to treat those pieces of pericardium?

5            MS. OBERTS:  Objection.  I'm not

6    sure there was a question there.

7            THE WITNESS:  Yeah, I would --

8    just make it into a question.  I agree.  I'd

9    like to hear a more succinct question.

10           MR. EGAN:  Sure.

11   BY MR. EGAN:

12   Q.  You understand that Dr. Buller has opined

13       that the pericardial patches made by Vascutek

14       are not noninfringing alternatives because

15       they are treated with a different

16       concentration of Glutaraldehyde than what

17       Medtronic uses with its pericardial coupons?

18           MS. OBERTS:  Objection to form.

19   I'm still not sure there's --

20           THE WITNESS:  Yeah, so when you

21   say --

22           MS. OBERTS:  -- a question there.

23           THE WITNESS:  When you say

24   noninfringing alternatives, we're speaking

25   with -- with -- we're speaking with respect

1      to the 271(f) is that --

2  BY MR. EGAN:

3  Q.  You -- you've reviewed Dr. --

4                  THE WITNESS:  -- that term that

5      you used.

6  BY MR. EGAN:

7  Q.  You've reviewed Dr. Buller's opinion,

8      correct?

9  A.  Yes.

10 Q.  Okay.  And Dr. Buller has opined that the

11     Vascutek pericardial patches are different

12     from the pericardial coupons and pericardial

13     sacks that are used by Medtronic --

14                 MS. OBERTS:  Objection.

15 BY MR. EGAN:

16 Q.  -- is that correct?

17                 MS. OBERTS:  Objection to form.

18     I'm still not sure if there's really a

19     question --

20                 THE WITNESS:  Different in shape?

21                 MS. OBERTS:  -- or a statement.

22                 THE WITNESS:  They're certainly

23     different in -- in -- they're certainly

24     different in geometry than the pericardial

25     coupons and the pericardial sacs.  I'm not

1          sure what the -- if you -- you're talking

2          relative to the -- the actual material?

3     BY MR. EGAN:

4     Q.   You -- you understand that Medtronic uses

5          a .25 percent concentration Glutaraldehyde to

6          treat its pericardial tissue?

7     A.   To fix the tissue.  That's a standard --

8          standard fixation of Glutaraldehyde, you

9          know, solution.  And there are probably

10         thousands of solutions people use, but you

11         always come to the same result, because you

12         wash out the Glutaraldehyde and you always go

13         to complete crosslinking.  So I understand

14         that that's the solution they use, yes.

15    Q.   Okay.  And you understand that the Vascutek

16         patches use a -- a different concentration of

17         Glutaraldehyde, correct?

18    A.   The patches use Gluta -- I don't understand

19         what you mean by the patches use -- you mean

20         the material from which the patches are

21         fabricated or fixed with a different

22         Glutaraldehyde concentration is -- try to

23         rephrase it and ask -- if that's your

24         question.

25    Q.   You're relying on the Vascutek pericardial

1    patches as a noninfringing alternative to

2    porcine pericardial tissue, are you not?

3                    MS. OBERTS:  Objection to form.

4                    THE WITNESS:  No, I'm saying that

5    they're -- that they're -- they're -- they're

6    fashioned from -- they are or can be

7    fashioned from the same pericardium -- the

8    same fixed pericardium or -- or coupon, which

9    is independent of the concentration of the

10   Glutaraldehyde.

11        Glutaraldehyde concentration -- you

12   always go to total crosslinking, total

13   fixation.  Every -- every lab in the world

14   probably has a different PET solution that

15   they do it with, but the end result, if you

16   took the -- if you took the pericardium fixed

17   in different solutions and whatever -- after

18   it's completely washed and cleaned or

19   whatever analysis you want, you might find

20   some difference of thickness and so forth

21   that's not related to the fixation.

22        You wouldn't -- in my opinion, you would

23   not be able to tell precisely what solution

24   was used to fix it.  You could certainly do

25   spectroscopic analysis and know that it was

```
1        fixed with Glutaraldehyde and not

2        formaldehyde, but you couldn't tell anything

3        about the -- the strength of the solution.

4        Because it's all about the kinetics.  If it's

5        a weaker solution, you leave it in longer.

6   BY MR. EGAN:

7   Q.   So it's your opinion that the concentration

8        of Glutaraldehyde used in Medtronic's

9        treatment processes of its porcine

10       pericardial tissue is irrelevant to the

11       271(f) analysis?

12            MS. OBERTS:  Objection to form,

13       asked and answered.

14            THE WITNESS:  Yeah, I'm not sure

15       that I'd say that's irrelevant to it.  I

16       mean, it's a -- it's a -- it's a solution

17       that they use that is effective in fixing the

18       tissue.

19          When you fix -- when you fix tissue in a

20       lab, if you've ever done that, you know,

21       there's no black or white.  You put it in

22       until it's totally crosslinked, so it's

23       either fixed or not fixed.

24          You can do it with formaldehyde.  These

25       days everyone does it with Glutaraldehyde,
```

1     but then the excess Glutaraldehyde is

2     evaporated or washed off and so forth, and

3     what you're left with is a completely fixed

4     tissue which is as -- as crosslinked as you

5     get it.

6         If you put it in Glutaraldehyde again,

7     you wouldn't change it any more than it

8     already is.  You've stabilized it, you've

9     biologically stabilized it, and the final

10    product you get is -- is not dependent on the

11    solution you use.

12        As long as the solution you use is

13    adequate to completely crosslinkage, you have

14    enough Glutaraldehyde to completely do the

15    chemical reaction, then -- then that's it.

16        If someone fixes coupon A with -- with

17    20 -- 25 percent, and it all goes to

18    completion, you wash out all the

19    Glutaraldehyde and salts and put it back and

20    buffer it, sterilize it, whatever, it's

21    irrelevant.  It's going to be exactly the

22    same.  And -- and it's independent of the

23    concentration of the Glutaraldehyde solution

24    or of other buffer salts or whatever may

25    be -- may be present in there.

```
 1          Every -- everyone has their -- it's like

 2     chicken soup, everyone has their own recipe,

 3     but it -- it's just -- and -- and often it's

 4     because one company inherits a recipe from

 5     another company and they don't want to change

 6     it for regulatory reasons and so forth.

 7          But I would say that the -- the method of

 8     fixation, the Glutaraldehyde, specific

 9     Glutaraldehyde solution doesn't have any

10     effect on the final coupon biological

11     stability, which is why you're fixing it.

12 BY MR. EGAN:

13 Q.   Could Medtronic change the concentration of

14     Glutaraldehyde used in its tissue fixation

15     process without telling the FDA?

16               MS. OBERTS:  Objection to form.

17               THE WITNESS:  I can't answer that

18     because I'm not -- I'm not a regulatory

19     person, but I -- I did talk to the people

20     at -- I did have a phone conversation, it's

21     in my report, with people at Medtronic, and

22     we talked about the solution, and that was

23     just the solution they've always used and

24     they were happy with the solution because it

25     worked, and -- and no one there seemed to
```

```
1        25 percent, in my opinion, it -- it really
2        wouldn't -- it really wouldn't make a
3        difference for the -- for what you achieved
4        with the -- with the final product.
5                    MR. EGAN:  Okay.  The videographer
6        is out of tape, so let's take a break and
7        we'll switch it.
8                    MS. OBERTS:  We can take a short
9        break.
10                   THE WITNESS:  We are going off the
11       record at 3:08 p.m.
12                   (Whereupon, a brief recess
13                    was taken.)
14                   THE VIDEOGRAPHER:  This is video
15       number 4 in the deposition of Dr. Gary Loomis
16       taken on April 15th, 2013.  The time now is
17       3:23 p.m.
18   BY MR. EGAN:
19   Q.  Dr. Loomis, you rely on pericardial patches
20       such as those sold by Vascutek as examples of
21       substantial noninfringing uses of pericardial
22       tissue, correct?
23   A.  Yeah, as I said that the -- I don't know if
24       that's exactly how I worded it in my report,
25       but I'm aware that there -- you know, that
```

1       there are patches used such as the ones sold

2       by Vascutek that are made out of the -- made

3       from the same pericardial coupons.

4  Q.  Okay.  And did you do any analysis to

5       determine how often porcine pericardial

6       patches are actually used in practice?

7  A.  No.

8  Q.  Okay.  Do you know whether any of the porcine

9       pericardial patches that you've identified in

10      your rebuttal expert report are approved for

11      use in Mexico?

12  A.  Oh, I have no idea.

13  Q.  Okay.  I'm going to hand you what's been

14      previously marked Plaintiff's Deposition

15      Exhibit 34.  And for the record, Plaintiff's

16      Deposition Exhibit 34 bears Bates numbers

17      MEDCORE 962759 to 963052.

18         This is another FDA submission that I

19      think you can better capture the title of if

20      you turn to MEDCORE 962764, several pages in.

21      There's a cover letter dated November 9th,

22      2011, with a Re: line, "IDE Supplement to

23      G100012 5-day Notice of IDE Change -

24      Implementation of an additional option for

25      shipping porcine tissue from Medtronic

1     would still be the same.

2            MR. EGAN:  Okay.

3  BY MR. EGAN:

4  Q.  So when you used the word proprietary, what

5     do you understand proprietary to mean?

6  A.  You know, I wasn't asked to opine on that

7     and -- and I don't -- that's why I don't want

8     to get into, you know, legal issues and so

9     forth.

10     But I'm going to say it, I think -- I

11    think in my mind proprietary means like

12    something you want to guard as a trade secret

13    because it gives you a step up on the

14    competition, it allows you to do something

15    that the competition can't do with their

16    normal fixation solutions.

17     So you have this very special fixation

18    solution that lets you do things that can't

19    be done with the other solutions, so

20    therefore you're keeping it secret.  And --

21    and in my mind and not -- and not knowing

22    anything about the legality of those terms,

23    that's what I as a working scientist would

24    say is a proprietary solution.

25  Q.  Okay.  One of the noninfringing alternatives

1      that you rely in your report is a pericardial

2      patch made by Pierson Surgical, correct?

3  A.  Yes.

4  Q.  Okay.  I'd like to hand you what we'll mark

5      as Exhibit 507.

6              (Whereupon, Exhibit 507 was

7              marked for identification.)

8  BY MR. EGAN:

9  Q.  For the record, Exhibit 507 bears Bates

10     number MEDCORE1003498.

11 A.  Yes.

12 Q.  Okay.  And this is a product description of

13     the No-React Porcine Pericardial Patches made

14     by Pierson Surgical?

15 A.  Yes.

16 Q.  Okay.  And do you see the section at the very

17     bottom titled, "About No-React"?

18 A.  Yes.

19 Q.  Okay.  And the second paragraph in that

20     section reads, "The No-React treatment is a

21     Heparin-based proprietary detoxification and

22     biomodification of Glutaraldehyde-treated

23     tissue that further stabilizes tissue

24     crosslinking and prevents the release of

25     aldehydes."

 1   A.   Uh-huh.

 2   Q.   Do you see that?

 3   A.   Yes.

 4   Q.   So do you agree that the Pierson Surgical

 5        porcine pericardial patch on which you're

 6        relying is treated with a proprietary

 7        Glutaraldehyde solution?

 8                   MS. OBERTS:  Objection to form.

 9                   THE WITNESS:  The -- the

10        Glutaraldehyde -- the solution that they have

11        is a -- is a -- it's -- it's not -- if you

12        read it, the treatment is not a fixation

13        solution, it's a heparin-based proprietary

14        detoxification and biomodification system.

15             So it's a solution, they've gotten a

16        trademark for it, they don't want to tell you

17        the exact concentration of heparin or exactly

18        what kind of heparin, which is an

19        anticoagulant, they used and so forth.

20             So they're essentially -- have a solution

21        here that's essentially made with a -- with a

22        drug, with heparin, with a biological agent.

23        And it's like most pharmaceutical companies

24        don't tell you exactly, except what they're

25        required by the FD -- with the FDA as to how

1    they put their solution together and so

2    forth.

3        So as I say, this is -- this is

4    because -- this is about the -- the solution

5    that they -- that they put it into when

6    they -- when they -- when they sell it.  This

7    is their No-React solution that they put it

8    into after starting -- after starting with a

9    fixed -- a fixed pericardium, and that's what

10   I -- a fixed tissue.

11       That's what I'm getting from this, that

12   their -- their term proprietary is that

13   they've got this detoxification and

14   biomodification treated tissue, that further

15   stabilizes it.

16       So they've already started with

17   stabilized tissue and then they've done it

18   with another solution that they've added to

19   it which they claim is called No-React and it

20   further stabilizes it and it has a lot more

21   in it than just Glutaraldehyde and -- and

22   buffer salts.

23       The solution with Medtronic for fixation,

24   all they have are -- are -- are normal buffer

25   salts and Glutaraldehyde and water.  This

1    thing that has -- is a heparin-based system,

2    so this -- and there are so many different

3    forms of heparin or heparin sulphate that one

4    could use.

5         And so I think that's -- that's what's

6    proprietary about this.  It's very -- it's

7    very different because it has this added

8    component that does more than just fix the

9    tissue, because it's a known -- it's a known

10   treatment for, you know, non-throm --

11   non-thrombotic properties to prevent

12   thrombosis.

13        So I don't think this relates -- I don't

14   think this -- what they're calling a

15   proprietary solution is the kind of solution

16   that's anything like what -- you know, what

17   Dr. Buller attests that Medtronic solution is

18   proprietary solution.  It's a completely --

19   it's a completely different thing.

20             MR. EGAN:  Okay.

21   BY MR. EGAN:

22   Q.  You haven't seen any evidence of Medtronic

23       treating its pericardial tissue with a

24       solution that includes heparin, have you?

25   A.  Not that I know of.

1 the record at 4:40 p.m.

2    (Whereupon, a brief recess

3    was taken.)

4    THE VIDEOGRAPHER:  This is video

5 number 5 in the deposition of Dr. Gary Loomis

6 taken on April 15th, 2013.  The time now is

7 4:56 p.m.

8 BY MR. EGAN:

9 Q.  Dr. Loomis, could you turn to page 9 of

10 Exhibit 502, which is your rebuttal report.

11 A.  Yes.  Page 9.

12 Q.  Okay?  Are you there?

13 A.  Yes.

14 Q.  Okay.  And the second to last paragraph

15 reads, "I have also been told to assume that

16 under 271(f)(2) it is not --

17 A.  Where are we?  Where are we at?  Page 6?

18 Q.  No, page 9.

19 A.  Oh, page 9.

20 Q.  The second to last paragraph.

21 A.  It was upside down.

22    MS. OBERTS:  I think the pages are

23 out of order.

24    THE WITNESS:  The pages are out of

25 order.  There we go.  That's what it was.

1       That's that two-sided thing.

2                 MR. EGAN:  That's not too bad for

3       six hours and only turning one page over.

4  BY MR. EGAN:

5  Q.  So are you on page 9?

6  A.  Yes.·

7  Q.  Okay.  And do you see the second to last

8       paragraph that reads --

9  A.  Yes.

10  Q.  -- "I have also been told to assume that

11       under 271(f)(2) it is not necessary that the

12       component actually be used by Medtronic or by

13       anyone in any other fashion, but only that

14       the component be suitable for substantial

15       noninfringing use."  Do you see that?

16  A.  Yes, I do see that.

17  Q.  Okay.  And did you follow your counsel's

18       instruction and make this assumption in your

19       report?

20  A.  I made the assumption in the report that it

21       would be suitable for noninfringing use,

22       yeah.

23  Q.  Okay.  And your opinion is premised on this

24       assumption, correct?

25  A.  My overall opinion is premised on that -- on

1        that assumption.

2    Q.   Okay.  If I could turn your attention to the

3         paragraph just above that, it reads, "I

4         understand that under 271(f)(1) a substantial

5         portion of the components must be supplied,

6         and I have been told to assume that more than

7         one component must be supplied."  Do you see

8         that?

9    A.   Yes.

10   Q.   Okay.  And did you follow your counsel's

11        instruction and make this assumption in your

12        report?

13   A.   Yes.

14   Q.   Okay.  And your opinion is premised on this

15        assumption?

16   A.   Yes.

17   Q.   Okay.  Could you turn to page 37 of your

18        rebuttal report.

19   A.   (Complies.)

20   Q.   Okay.  And just above section B that's

21        titled, "An 18 French Arterial Introducer,"

22        do you see the paragraph starting, "I have

23        been asked"?

24   A.   Yeah.  Yes.

25   Q.   Okay.  You write, "I have been asked to